UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

BAKER RANCHES, INC., *et al.*,

Plaintiffs,

v.

RYAN ZINKE, *et al.*,

Defendants.

Case No. 3:18-cv-00261-RFB-CLB

**ORDER**

## I.    INTRODUCTION

Before the Court are Plaintiffs' Motion for Partial Summary Judgment (ECF No. 48) and Defendants' Motion for Summary Judgment (ECF No. 49).

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed suit in federal court on June 5, 2018. ECF No 1. On February 26, 2019, Plaintiffs filed an Amended Complaint, which is the operative complaint. ECF No. 30. The Amended Complaint asserts five claims for relief: (1) quiet title under the Quiet Title Act, 28 U.S.C. §§ 1346f and 2409a; (2) declaratory judgment under 28 U.S.C. § 2201 to a recognized right-of-way or easement across United States National Park Service lands; (3) a writ of mandamus under 28 U.S.C. § 1361 compelling the defendants to provide a right-of-way or easement across National Park Service lands; (4) trespass; and (5) equitable or promissory estoppel. Id.

On January 4, 2019, Defendants moved to stay the case due to lapse in appropriations funding from the U.S. Department of Justice. ECF No. 23. The motion was granted on January 7, 2019 (ECF No. 24) and the stay was lifted on February 19, 2019. ECF No. 25.

The parties filed stipulated findings of fact on September 25, 2019, ECF No. 47, which were signed by this Court on October 22, 2019. ECF No. 50. The instant Motions for Summary Judgment were filed on October 21, 2019. ECF Nos. 48, 49. The parties responded to the cross motions on November 27, 2019, ECF Nos. 51, 52, and replied on December 20, 2019, ECF Nos.

53, 54.

Oral argument was held on November 25, 2020. ECF No. 56. The Court withheld its ruling until certain pending cases before the Nevada Supreme Court regarding water rights were resolved. As the Court has determined that any pending cases before the Nevada Supreme Court which impact the ruling have been resolved, this order follows.

## III.    FACTUAL AND LEGAL BACKGROUND

This is a water rights dispute in which Plaintiffs bring claims for rights-of-way or easements within Great Basin National Park (the "Park"). Great Basin National Park is wholly located within the state of Nevada.

Unless otherwise indicated, the Court finds the following facts to be undisputed, based on the parties' stipulated findings of fact. See ECF Nos. 47, 50.

### A.  <u>Great Basin National Park and the Underlying Lands</u>

Prior to 1909, the lands underlying this dispute were part of the public domain. The public domain "consists of the lands belonging to the American public and held and administered through the national government." 7 Thompson on Real Property, Thomas Editions § 55.02(a); <u>see also</u> <u>In re Water of Hallett Creek Stream Sys.</u>, 749 P.2d 324, 335 (Cal. 1988) ("[T]he term 'public lands' (or 'public domain') refers to lands owned by the federal government which have remained open to settlement, public sale or other disposition, and/or are now administered by the Department of the Interior through the Bureau of Land Management." (citing <u>Fed. Power Comm'n v. Oregon</u>, 349 U.S. 435, 443-444 (1955))). "As the owner of the public domain, the government possess[es] the power to dispose of land and water thereon together, or to dispose of them separately." <u>Cal. Oregon Power Co. v. Beaver Portland Cement Co.</u>, 295 U.S. 142, 163 (1935).

On February 10, 1909, the lands were withdrawn from the public domain and incorporated into the Nevada National Forest. They were managed by the United States Forest Service ("Forest Service"). In 1957, the Nevada National Forest was incorporated into the Humboldt National Forest. In 1986, Congress passed the Great Basin National Park Enabling Act, Pub. L. 99-565 ("Enabling Act"), which converted the subject lands into the Great Basin National Park. The lands

are currently managed by the National Park Service ("NPS").

The Enabling Act provided that the withdrawal of the lands for the Park was "subject to valid existing rights." 16 U.S.C. § 410mm-1(d). Creation of the Park was not to be "construed to establish a new express or implied reservation to the United States of any water or water-related right with respect to" the lands withdrawn. Id. at -1(h). Instead, the United States would be "entitled to only that express or implied reserved water right which may have been associated with the initial establishment and withdrawal of Humboldt National Forest and the Lehman Caves National Monument from the public domain." Id. The Enabling Act further provided that the appropriation of water within the Park would be authorized only insofar as it occurred "in accordance with the substantive and procedural law of the State of Nevada." Id.

Upon creation of the Park, the NPS requested that the Nevada State Engineer provide an assessment of all existing water rights within the limits of and in the general vicinity of the Park. Accordingly, on May 8, 1987, the Nevada Division of Water Planning issued the Great Basin National Park Water Right Assessment (the "Water Right Assessment" or "Assessment"). The Assessment was sent to the NPS.

///
///
///
///
///
///
///
///
///
///
///
///
///

1

2    **B. Snake Creek and Baker Creek**

3    The bodies of water at the center of this dispute are Snake Creek and Baker Creek, both of

4    which originate within the Park. See Figure A.



*Figure A* (ECF No. 49-2).

Snake Creek flows generally west to east and out of the Park into Utah. Snake Creek's headwaters

arise inside the Park, approximately 8 miles from the Park's boundary. Snake Creek leaves the

park approximately 4.5 miles from the Nevada-Utah state line.

In 1962, prior to the creation of the Park and while the underlying lands were part of the

Humboldt National Forest, the Forest Service issued a Special Use Permit to the Snake Creek

Irrigation Company to construct a three-mile concrete pipeline (the "Snake Creek Pipeline" or

"Pipeline") to transport water through a portion of Snake Creek. The Pipeline was constructed to

mitigate water loss in a "losing reach" of the Creek, where water was seeping into the ground as it flowed downstream. The Pipeline was constructed on unsurveyed federal land and located wholly within Nevada. On March 1, 1978, the Forest Service issued a second Special Use Permit to the Snake Creek Irrigation Company for construction and maintenance of the Pipeline. The second permit was amended on January 2, 1985 and expired on February 28, 1986. No further permits were issued by the Forest Service, and since creation of the Park, the NPS has not issued any special use permit for the Pipeline. Water has flowed through the Pipeline every year since the creation of the Park. Beginning in 2016, water began leaking from the Pipeline.

Like Snake Creek, Baker Creek also flows generally west to east and out of the Park, with its headwaters arising within the Park. Approximately six miles of Baker Creek are located within the Park. Unlike Snake Creek, which flows from Nevada into Utah, Baker Creek is wholly contained within the state of Nevada.

Over the years, members of the public have created obstructions and man-made dams within Baker Creek, inside the Park.

## C.  <u>The Snake Creek Plaintiffs</u>

Plaintiffs Baker Ranches, Inc.; Darwin C. Wheeler; and Owen L. and Patricia T. Gonder (collectively, "the Snake Creek Plaintiffs") own farming and ranching land in Millard County, Utah, just across the state line. Their land is irrigated by a diversion from Snake Creek in Utah, approximately 5-7 miles downstream from the Park boundary.

On May 17, 1910, the Fifth Judicial District Court in Millard County, Utah, entered a Decree in a quiet title action captioned <u>George W. Gonder, et al. v. John Doe</u> ("the Snake Creek Decree" or "Decree"). ECF No. 50, ¶ 9. The Snake Creek Decree held that the plaintiffs to that case and their successors are:

> The exclusive owners of the right to the uses of all of the waters of said Snake Creek for irrigation purposes from March 1st to November 15th, in each and every year, and all adverse claims to the right to the use of any of the waters of said creek during the period of time above specified, are hereby adjudged to be null and void.
>
> <u>Id.</u> at ¶ 10.

The Snake Creek Decree awarded water rights to the plaintiffs in that case and their successors, "to irrigate about 620 acres of land." Id. Plaintiffs' water rights accrued no later than 1880.

In 1962, the successors-in-interest to the rights of the plaintiffs in the Snake Creek Decree, who are also the predecessors to the instant Snake Creek Plaintiffs, filed diligence claims[1] to secure their surface water rights based on the rights adjudicated in the Snake Creek Decree. The Utah State Engineer assigned water rights numbers 18-249, 18-250, 18-251, ad 18-257 in response to the diligence claims.

In 2016, the NPS denied the request of the Snake Creek Plaintiffs to perform maintenance and repairs to the Sake Creek Pipeline. The NPS stated that no further maintenance or repairs could be conducted until environmental review was accomplished pursuant to the National Environmental Policy Act ("NEPA") of 1970 and a new special use authorization was issued by the NPS. The Snake Creek Plaintiffs allege that by preventing them from being able to maintain and repair the Pipeline, which has been leaking since 2016, Defendants interfere with Plaintiffs' ability to exercise their water rights and to put the waters of Snake Creek to beneficial use.

### D.  The Baker Creek Plaintiffs

Plaintiffs Baker Ranches, Inc.; David John Eldridge and Ruth Eldridge, as Co-Trustees of The David John Eldridge and Ruth Eldridge Family Living Trust, dated January 31, 2007; Zane Jordan; and Judee Schaley (collectively, "the Baker Creek Plaintiffs") own farming and ranching lands in White Pine County, Nevada, which is located approximately 4.5 to 8.5 miles outside of the Park's boundary. Plaintiffs divert water from Baker Creek for irrigation of their lands, from a point approximately four miles downstream of the Park boundary and outside of the Park.

On October 16, 1934, the Seventh Judicial District Court in and for White Pine County, Nevada, entered Findings of Fact, Conclusions of Law, and Decree in the Matter of the Determination of the Relative Rights in and to the Waters of Baker and Lehman Creeks and

---

[1] In 1903, statutory administrative procedures to appropriate water were first established in Utah. After 1903, the exclusive method of obtaining a new surface water right was through filing an application to appropriate with the State Engineer and obtaining a certificate of beneficial use. Those seeking to secure surface water rights that were established prior to 1903 could do so through the filing of diligence claims.

<u>Tributaries in the County of White Pine, State of Nevada</u>, which was amended on February 3, 1950 (the "Baker-Lehman Decree"). The Baker-Lehman Decree adjudicated the respective rights to the waters of Baker and Lehman Creeks and their tributaries.

Under the Baker-Lehman Decree, the Baker Creek Plaintiffs hold the following water rights to Baker Creek, with the following priority dates:

> Plaintiff Baker Ranches, Inc.'s share of Proof of Appropriation No. 01066 is appurtenant to 1,751.87 acres and has multiple priority dates ranging from 1872 to 1904.

> Plaintiff David John Eldridge and Ruth Eldridge Family Living Trust's ½ share of Proof of Appropriation No. 01066 is appurtenant to 8.8 acres and has a priority date of 1872.

> Plaintiffs Zane Jordan's and Judee Shaley's share of Proof of Appropriation No. 01066 is appurtenant to 7.13 acres and has a priority date of 1876.

> <u>Id.</u> at ¶ 30.

The Baker-Lehman Decree further provided that "each and every water user of the Baker and Lehman Creeks stream system and its tributaries," and all "respective successors in interest" were "perpetually enjoined and restrained" from: (1) "diverting or using or preventing or obstructing the flow . . . of any of the water or said stream system, except to the extent and in the amount and in the manner and at the time or times fixed by this Decree . . . ."; (2) "diverting from the natural channel and from using any of the said water for irrigation or any other purpose in excess of the amount specifically allotted to or for said party herein and fixed by this Decree . . . ."; (3) "diverting from the natural channel and from using any of the said waters in any other manner or for any other purpose or purposes or upon any other land or lands or in any other amount than as provided and prescribed by the terms of this Decree . . . ."; (4) "diverting from the natural channel and from using any of the said water at any other time or times than as specified and provided by the terms of this Decree . . . ."; and (5) "in any manner meddling with, opening, closing, changing, injuring, or interfering with any headgates, weirs, water-boxes, flumes, or measuring devices, or either or any of them, placed, installed, established, or approved by said State Engineer or by his authority

1

or direction . . . ." <u>Id.</u> at ¶ 31.

2

3

The Baker Creek Plaintiffs allege that Defendants have interfered with Plaintiffs' rights to

4

appropriate water from Baker Creek by barring Plaintiffs from removing the man-made dams and

5

obstructions that have appeared in the creek.

6

### IV.    LEGAL STANDARD

7

8

Summary judgment is appropriate "if the movant shows there is no genuine issue as to any

9

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

10

substantive law governing a matter determines which facts are material to a case. <u>Anderson v.</u>
<u>Liberty Lobby</u>, 477 U.S. 242, 248 (1986).

11

12

When considering the propriety of summary judgment, the court views all facts and draws

13

all inferences in the light most favorable to the nonmoving party.  <u>Gonzalez v. City of Anaheim</u>,

14

747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must

15

do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where

16

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

17

there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (alteration in original)

18

(internal quotation marks omitted). The nonmoving party may not merely rest on the allegations

19

of her pleadings; rather, she must produce specific facts—by affidavit or other evidence—showing

20

a genuine issue of fact. <u>Anderson</u>, 477 U.S. at 256. It is improper for the Court to resolve genuine

21

factual disputes or make credibility determinations at the summary judgment stage. <u>Zetwick v.</u>
<u>Cty. of Yolo</u>, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

22

23

### V.    DISCUSSION

24

Plaintiffs move for summary judgment on their first, second, and third claims.  ECF No.

25

48. Defendants move for summary judgment as to all of Plaintiffs' claims. ECF No. 49.

26

The Court addresses each of Plaintiffs' claims in turn.

27

**A.  <u>Claims 1-3: Quiet Title Act, Declaratory Judgment Act, and Writ of</u>**

28

**<u>Mandamus</u>**

Plaintiffs' first claim seeks to quiet title under the Quiet Title Act, 28 U.S.C. §§ 1346(f) and 2409a, for a recognized right-of-way or easement through the Park, in order to protect Plaintiffs' rights to appropriate water from Snake Creek (and specifically, from the Snake Creek Pipeline), and Baker Creek. Plaintiffs' second claim seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, recognizing a right-of-way or easement across the Park. Plaintiffs' third claim seeks a writ of mandamus pursuant to 28 U.S.C. § 1361, to compel Defendants to provide a right-of-way or easement across the Park.

For the reasons stated herein, the Court grants Defendants' motion for summary judgment with respect to the Baker Creek and Snake Creek Plaintiffs' first, second, and third claims, and denies Plaintiffs' motion for summary judgment with respect to those claims.

### 1.  Subject Matter Jurisdiction under the Quiet Title Act

The Court first addresses whether it has subject matter jurisdiction to hear Plaintiffs' claims brought under the Quiet Title Act, 28 U.S.C. § 2409a ("QTA"). See 28 U.S.C. § 1346(f) (granting district courts exclusive original jurisdiction over civil actions arising under the Quiet Title Act).

The QTA "waives sovereign immunity to suits against the United States to adjudicate title disputes involving real property in which the United States claims an interest." Michel v. United States, Dep't of the Interior, 65 F.3d 130, 131 (9th Cir. 1995) (internal quotations omitted). It provides that "[t]he United States may be named as a party defendant in a civil action . . . to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 USC § 2409a(a). To state a claim under the Quiet Title Act, a plaintiff must allege: (1) that the United States claims an interest in the real property at issue, and (2) there is disputed title to the property. Id. The plaintiff must "set forth with particularity the nature of the right, title, or interest which plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." Id.

An action initiated under the QTA must be brought within twelve years "of the date plaintiff or his predecessor in interest knew or should have known of the claim of the United States." Michel, 65 F.3d at 131 (quoting 28 U.S.C. § 2409a(g)). The QTA statute of limitations is to be strictly construed in favor of the United States. Expl. & Prod. Co. v. United States, 506 F.3d

1182, 1185-86 (9th Cir. 2007). Where, as here, a plaintiff claims a non-possessory interest such as an easement or right-of-way, the plaintiff's cause of action begins to accrue when the government "adversely to the interests of plaintiffs, denies or limits the use of the roadway for access to plaintiffs' property." Michel, 65 F.3d at 131-32 (quoting Werner v. United States, 9 F.3d 1514, 1516 (11th Cir. 1993)). Mere knowledge of the government's claim of title is not sufficient to trigger the running of the statute of limitations period. Id. To determine when the QTA claim begins to accrue, the court considers when there is a reasonable awareness that the United States claimed some interest adverse to the Plaintiff. State of Cal ex rel., State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393, 397 (9th Cir. 1985) (hereinafter Yuba Goldfields); McFarland v. Norton, 425 F.3d 724, 727 (9th Cir. 2005) (asking whether a reasonable person "knew or should have known the government claimed the exclusive right to deny access").

The Court first finds that Plaintiffs have sufficiently alleged claims under the QTA. Plaintiffs allege that there is disputed title to Snake Creek, the Pipeline, and Baker Creek, and that the has denied Plaintiffs their lawful right-of-way or easement to operate and maintain the Pipeline and to appropriate water from Baker Creek. They claim that they have vested rights-of-way or easements within the Park pursuant to two federal "rights-of-way" acts: the Mining Act of July 26, 1866, 14 Stat. 253, codified at 43 U.S.C. § (the "1866 Act"), and the Act of March 3, 1891, 26 Stat. 1095, 1101, later codified at 43 U.S.C. §§ 946-949 (the "1891 Act").[2] The Court finds that Plaintiffs have sufficiently alleged with particularity the interest claimed in Snake Creek, the Pipeline, and Baker Creek, and the interest over these properties claimed by the United States. 28 U.S.C. § 2409a(a).

The Court next addresses whether Plaintiffs' claims to Snake Creek are barred by the QTA's statute of limitations. Defendants argue that Plaintiffs' claims on Snake Creek should be

---

[2] In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA") to address a "tangled array of laws granting rights-of-way across federal lands." United States v. Jenks, 22 F.3d 1513, 1515 (10th Cir. 1994). The FLPMA repealed the right-of-way provisions of both the 1866 and 1891 Acts, but preserved rights-of-way that were established under those Acts prior to the FLPMA's passage. See 43 U.S.C. § 1769.

dismissed because they were filed outside of the QTA's twelve-year statute of limitations. Defendants assert that when the Forest Service issued the 1962 and 1978 Special Use Permits to Plaintiffs' purported predecessors-in-interest, the permits contained specific limiting terms and conditions about the construction and use of the Pipeline, which should have put Plaintiffs on notice that the federal government claimed an interest in the Pipeline and intended to restrict Plaintiffs' access to it. They note that the permit explicitly stated that it was temporary, non-transferable, and subject to discretionary termination by the Forest Service. They also emphasize that the permit stated it conferred no right to the use of the water flowing through the Pipeline, and that any related improvements on the Pipeline would become federal property if not removed after expiration of the permit. Based on these limitations, Defendants argue, any reasonable person would have known that the permit conveyed no permanent right-of-way to the Pipeline, that the Government claimed a right to deny access to the Pipeline at any time, and that the Pipeline became exclusive federal property after the expiration of the second Special Use Permit in 1986. Defendants argue that Plaintiffs' QTA claims on Snake Creek are accordingly time-barred, as the statute of limitations was triggered as early as 1962 (and thus ran in 1974).

The Snake Creek Plaintiffs respond that the conditions of the Special Use Permits were not sufficient to put their predecessors-in-interest on notice that the United States claimed exclusive interest in the Pipeline, because the language contained within those permits derived from agency policies, regulations, and templates of the time. Plaintiffs argue that, where restrictions imposed upon an easement are consistent with a federal agency acting in a strictly regulatory capacity, a claimant is not sufficiently warned that the federal government is claiming an interest adverse to the claimant's. Had the United States intended to express an exclusive interest in the Pipeline through its Special Use Permits, Plaintiffs argue, it should have included requirements unique to the circumstances of Snake Creek and the Pipeline, as opposed to boilerplate regulatory language. Further, to the extent the permits stated they were revocable or non-transferable, Plaintiffs argue that these conditions did not make clear that the Government contested the existence of Plaintiffs' right-of-way to the Pipeline. Plaintiffs emphasize that the permit stated that it was "subject to all valid claims," and that Plaintiffs had a reasonable belief that they had a valid claim to the Pipeline

and its waters under state and federal law. Plaintiffs further argue that even if the language in the Special Use Permits triggered the QTA's statute of limitations, the Government abandoned any claim to the Pipeline because the NPS continuously authorized Plaintiffs' repairs and maintenance to the Pipeline from 1986 until at least 2016.

The Court first finds that the Government's issuance of Special Use Permits did not – in and of itself – signify a clear intent to restrict or limit Plaintiffs' access to their purported easement on the Pipeline. Yuba Goldfields, 752 F.2d at 397. When the government holds the "alleged servient tenement," as is the case here, it has the "right to reasonable use of its land" such that "mild interference with the use of an easement pursuant to the government's own property interests will not start the statute of limitations running." Skrank v. Castenada, 524 F.3d 1213, 1216-17 (9th Cir. 2005) (quoting McFarland v. Norton, 425 F.3d 724, 727 (9th Cir. 2005)). Moreover, "[t]o avoid forcing landowners and the government into premature, and often unnecessary, suits, [courts] should not lightly assume that regulatory or supervisory actions, as opposed to those that deny the easement's existence, will trigger the statute of limitations." McFarland, 425 F.3d at 727 (internal quotations omitted). At the time of the issuance of the Special Use Permits, the Forest Service was authorized to make rules and regulations regarding the occupancy and use of the national forests. See 16 U.S.C. § 551. That authority was "considerable," and gave the Forest Service the right to reasonably regulate the exercise of vested water rights and accompanying rights-of-way, without such regulations amounting to a challenge to the vested rights. See Elko Cty. Bd. of Supervisors v. Glickman, 909 F. Supp. 759, 764 (D. Nev. Nov. 17, 1995) (citing Adams v. United States, 3 F.3d 1254, 1260 (9th Cir. 1993)); Nevada Land Action Ass'n v. United States Forest Service, 8 F.3d 713, 719 n.9 (9th Cir. 1993); Grindstone Butte Project v. Kleppe, 638 F.2d 100, 103 (9th Cir. 1981); Hyrup v. Kleppe, 406 F. Supp. 241, 216-17 (D. Colo. Jan. 14, 1975)). Parties with vested rights and rights-of-way within federal forests were routinely required to seek special use permits prior to commencing any construction on the land. See Elko, 909 F. Supp. at 765-66. The Courts finds that a reasonable interpretation of the issuance of such time-limited permits is that they reflected the regulatory authority of the federal government and not an implicit assertion of exclusive rights to the land and/or water that was the subject of such permits.

Second, the Court finds that the specific conditions within the 1962 and 1978 Special Use Permits would not have made Plaintiffs' predecessors "reasonably aware" of the Government's purported adverse interest in the Pipeline. Yuba Goldfields, 752 F.2d at 397. The permits stated that they were non-transferrable, but at the time, Congress required that contracts issued by the United States include such non-transferability provisions – thus, that the permits contained such a clause would not have reasonably indicated to Plaintiffs' predecessors that the Government was claiming an adverse or superior interest in the Pipeline. See 41 U.S.C. § 15(a); see also 41 U.S.C. § 6305(a). In addition, both the revocability and abandonment provisions in the Special Use Permits existed in identical form in the 1954 Forest Service Manual's special use permit template. Moreover, the abandonment provision of the Special Use Permits was nearly identical to Title 36 C.F.R. § 251.60, a regulation under which the Forest Service was provided avenues to terminate, revoke, or suspend special use authorizations. Indeed, similar provisions were included in special use authorizations issued by the Government in Overland Ditch and Reservoir Company, No. 96-N-797, 1996 WL 33484927 (D. Colo. Dec. 16, 1996) (special use permit to expand a reservoir on federal land), and Roth v. United States, 326 F. Supp. 2d 1163, 1168 (D. Mont. 2003) (special use permit to build dam on government land contained condition that it was terminable at the discretion of the agency). In both Overland Ditch and Roth, the district courts determined that the special use permits were not mutually exclusive with a government acknowledgement of Plaintiffs' easement.

The Court also finds that certain provisions contained within the Special Use Permits would have signaled to Plaintiffs' predecessors that their easement on the Pipeline could coexist with Forest Service regulation. First, the Special Use Permits stated that they were "subject to all valid claims." The plain language of this phrase clearly indicates that these permits were not intended to conflict with or supersede existing legal claims that might be implicated in the permits. Second, the 1962 permit also stated that while it conferred "no right upon the permittee to the use of the water involved," such right could "be obtained and retained under applicable state law." See ECF No. 48-8 at 3, ¶ 5; ECF No. 48-9 at 3, ¶ 6; ECF No. 49-3 at 4, ¶ 18. The Court finds that a reasonable permittee could have read these provisions and understood them to mean that the Government

would continue to recognize existing rights-of-way to the Pipeline, as established under state or federal law.

Finally, the Court observes that even if the United States asserted an adverse claim over the Pipeline, the record does not demonstrate that the Snake Creek Plaintiffs or their alleged predecessors-in-interest knew or should have known about that interest, given the NPS's behavior from 1986 through 2016. See Shultz v. Department of Army, 886 F.2d 1157, 1161 (9th Cir. 1989) ("If the government has apparently abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted."). There is no evidence that, after the second Special Use Permit expired in 1986, the Forest Service or National Park Service required the Snake Creek Irrigation Company (or their successors) to restore the site or remove the Pipeline or any improvements. Nor did the Government require Plaintiffs to apply for any additional special use permits or other kinds of authorization to maintain the Pipeline. Instead, the evidence indicates that Plaintiffs and their predecessors-in-interest continued to use and regularly maintain the Pipeline after the last Special Use Permit expired, with the NPS's direct knowledge. See ECF No. 48-2, at ¶ 17; ECF No. 48-13, at 2 (NPS memorandum stating, "no special use permit has ever been issued by [Great Basin National Park], but yearly maintenance is conducted by downstream users"); ECF No. 51-7 (NPS telephone conversation memorandum indicating that NPS personnel provided advice to Plaintiffs about repairs and installation of a security device on the Pipeline intake structure); ECF No. 51-8 at 28-29 (deposition testimony of Al Hendricks, the former Superintendent of the Great Basin National Park at, stating that it was a "wise thing to advise something who is responsible for what might be hazard" on repairs to the Pipeline).

Based on the foregoing, the Court finds that the evidence in this case indicates that the restrictions on access to the Pipeline set forth in the Special Use Permits were consistent with the Forest Service "acting in a regulatory capacity," rather than "in the capacity of a landowner claiming exclusive rights." Skranak, 425 F.3d at 1217. The Court finds that the 1962 and 1978 permits did not deny or limit Plaintiffs' access to the Pipeline so as to constitute a challenge to Plaintiffs' purported easement, and that NPS authorized the Snake Creek Plaintiffs or their

predecessors-in-interest to repair and maintain the Pipeline until at least 2016. The Court does not find that a reasonable person under the circumstances "knew or should have known the government claimed the exclusive right to deny access" to the Pipeline. McFarland, 425 F.3d at 727. As such, the Court will not dismiss Plaintiffs' QTA claim over Snake Creek for falling outside of the twelve-year statute of limitations.

The Court also finds that Plaintiffs' claims to Baker Creek were timely raised. Defendants do not argue otherwise. The Court finds it to be undisputed that the Government first denied the Baker Creek Plaintiffs access to Baker Creek in 2012, when NPS law enforcement detained Craig and Dave Baker for attempting to remove a man-made dam from Baker Creek inside the Park. Thus, any denial of access by the Government would have first occurred roughly six years prior to the initiation of this lawsuit. The Court accordingly finds that Plaintiffs' QTA claims over Baker Creek are not time-barred.

### 2. Rights to Snake Creek

Having established that Plaintiffs' claims are not barred for falling outside of the QTA's twelve-year statute of limitations, the Court next addresses whether the Snake Creek Plaintiffs possess a right-of-way in Snake Creek that would permit them to enter the Park to operate and maintain the Snake Creek Pipeline.

Plaintiffs claim rights-of-way or easements to the waters of Snake Creek located within the Park (and flowing through the Pipeline, specifically) pursuant to two "rights-of-way" acts: the Mining Act of July 26, 1866, 14 Stat. 253, codified at 43 U.S.C. § (the "1866 Act"), and the Act of March 3, 1891, 26 Stat. 1095, 1101, later codified at 43 U.S.C. §§ 946-949 (the "1891 Act").[3]

Plaintiffs first argue they have a right-of-way to the waters of Snake Creek that are located within the Park under the 1866 Act. The 1866 Act provided federal protection to water rights and

---

[3] In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA") to address a "tangled array of laws granting rights-of-way across federal lands." United States v. Jenks, 22 F.3d 1513, 1515 (10th Cir. 1994). The FLPMA repealed the right-of-way provisions of both the 1866 and 1891 Acts, but preserved rights-of-way that were established under those Acts prior to the FLPMA's passage. Pub. L. No. 94–579 § 701(a), 90 Stat. 2743.

rights-of-way on public land that were established pursuant to state and local law and custom. See Andrus v. Charleston Stone Prods. Co., Inc., 436 U.S. 604, 614 (1978). Plaintiffs argue that it is undisputed that their rights to Snake Creek vested and accrued under Utah law by 1880, before the lands encompassing Snake Creek were withdrawn from the public domain in 1909 with the establishment of the Nevada National Forest. Plaintiffs acknowledge that Snake Creek originates within the Park in Nevada, while their water rights in Utah permit water to be diverted from Snake Creek in Utah for irrigation purposes in Millard County, Utah. However, they argue this distinction does not diminish their interest in the Creek's water from its headwaters to its points of diversion.

Plaintiffs rely on the doctrine of prior appropriation, which provides that priority to water rights is determined based on who is "first in time, first in right to put the water to beneficial use." Diamond Nat. Res. Prot. & Conservation Ass'n v. Diamond Valley Ranch, LLC, __ P.3d __, 2022 Nev. LEXIS 41, at *3 (Nev. 2022) (hereinafter Diamond Valley Ranch). Plaintiffs contend that under Nevada and Utah law, where already appropriated water crosses the property of another, the burdened property owner has no right to the water, and the prior appropriator has the right to take and use the water within the whole of the water channel to the extent indicated by the prior appropriation. Because Plaintiffs had already appropriated the water flowing within Snake Creek by the time the lands were withdrawn from the public domain, Plaintiffs argue that the federal government – as the "burdened property owner" – has no right to prevent Plaintiffs from taking and using the water flowing through the Park to the extent established when Plaintiffs' rights vested in 1880. Plaintiffs argue that Defendants interfere with Plaintiffs' ability to exercise their established water rights by prohibiting them from making upstream repairs to the Pipeline to prevent downstream water loss in Utah.

Plaintiffs further argue that under the language of the 1866 Act, the scope of their right-of-way includes the Snake Creek Pipeline. Plaintiffs look to the language of the Act, which provided that "the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed." Act of July 26, 1866, ch. 262, § 9, 14 Stat. 253 (codified at 43 U.S.C. § 661). Plaintiffs argue that "ditches and canals" are terms "'broad enough' to include reservoirs, dams, flumes, pipes, and tunnels as analogous or incidental to, and discharging the

functions of, such ditches and canals." ECF No. 48 at 16-17. They further note that the Act expressly grants rights-of-way for "mining, agricultural, manufacturing, or other purposes," with no restriction on the method used to convey water for such purposes. Absent an explicit limitation, Plaintiffs argue a change in the manner of use of their right-of-way is permitted, so long as it remains within the physical boundaries of the existing right-of-way. Plaintiffs contend that a pipeline had to be constructed given the need for modernization; thus it would be unreasonable to bar Plaintiffs from operating or maintaining the Pipeline given their right-of-way to the creek.

Next, Plaintiffs argue they also have a right-of-way to the upstream portion of Snake Creek (including the Pipeline) under the 1891 Act. Section 18 of the Act granted rights-of-way "through the public lands and reservations of the United States . . . to any canal ditch company, irrigation or drainage district formed for the purpose of irrigation or drainage." 26 Stat. 1101-02 (formerly codified at 43 U.S.C. § 946). Under Section 19 of the Act, "[a]ny canal or ditch company desiring to secure the benefits of th[e] act" was required to "file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir." 26 Stat. 1102 (formerly codified at 43 U.S.C. § 947). For surveyed lands, the filing had to occur "within twelve months after the location of ten miles of its canal," and for unsurveyed lands, the filing had to occur "within twelve months after the survey [was conducted] by the United States." Id. Upon "approval thereof by the Secretary of the Interior," the right-of-way applied for would be recorded on government plats, and the underlying land would become "subject to such right-of-way." Id.

Plaintiffs acknowledge that the Act references the filing of maps and approval by the Secretary of the Interior (the "Secretary") to secure a right-of-way, but they argue that this filing process requirement applied to surveyed lands. Plaintiffs argue that under the 1891 Act, rights-of-way could vest on unsurveyed lands upon construction of a water conveyance (such as a ditch or Pipeline). Plaintiffs argue that maps of unsurveyed lands were accepted for informational purposes only, not approved by the federal government, and therefore did not need to be filed and approved for the purposes of creating a right-of-way. Plaintiffs argue it would "make[] little sense to construe the 1891 Act as requiring [the Secretary's] approval to vest [on unsurveyed lands]," because "there would be no legal means of protecting the investment in ditches, canals and reservoirs on

- 17 -

unsurveyed public lands pending the survey." ECF No. 48 at 24 (citing Roth v. United States, 326 F. Supp. 2d 1163, 1173 (D. Mont. Dec. 12, 2003)). Plaintiffs urge this Court to accept the vesting-by-construction interpretation of the 1891 Act and find that because the Pipeline was constructed on unsurveyed lands within the Humboldt National Forest, Plaintiffs' right-of-way to the Pipeline vested upon completion of construction of the Pipeline.

Defendants argue that there is no evidence in the record to support the claim that the Snake Creek Plaintiffs have a right-of-way to the Pipeline within the Park under either the 1866 or 1891 Acts. Defendants argue that Plaintiffs' Utah water rights do not grant them any right-of-way to the Pipeline, when the Pipeline is not connected to Plaintiffs' private property, is located on federal land, and sits miles upstream and in another state from where the water is diverted and used to irrigate Plaintiffs' property. Central to Defendants' argument is the notion that Plaintiffs' Utah water rights are distinct from any easement or right-of-way upon the Pipeline itself, which conveys water solely in Nevada.

First, Defendants argue Plaintiffs also do not have a right-of-way to the Pipeline under the 1866 Act. Defendants contend that the 1866 Act applied only to public lands and not those reserved from the public domain; because the Pipeline was constructed on federal lands that were already withdrawn from the public domain in 1909 with the formation of the Nevada National Forest, Defendants argue the 1866 Act does not confer a right-of-way to the Pipeline. Defendants urge this Court to reject Plaintiffs' argument that they have a right-of-way to the Pipeline because their downstream water rights were established prior to the 1909 withdrawal of the land from the public domain. Defendants argue it is "patently obvious" that Plaintiffs could not have acquired a right-of-way prior to construction of the Pipeline, as no right-of-way vests against the government under the 1866 Act "unaccompanied by any labor" on the land. ECF No. 52 (quoting Bear Lake & River Waterworks & Irrigation Co. v. Garland, 164 U.S. 1, 18 (1896)).

Furthermore, Defendants argue that while Plaintiffs hold a water right to the downstream waters in Utah, they do not hold any right to the Pipeline itself. Defendants argue there is no legal authority to support the notion that Plaintiffs' Utah water rights – which allow water to be diverted from Snake Creek in Utah, five to seven miles downstream from Great Basin National Park's

boundaries – also confer upon Plaintiffs a right to divert water through the Pipeline, located several miles upstream from Plaintiffs' lands, in Nevada. In support of this argument, Defendants point to Plaintiffs' 2006 filing of a Proof of Appropriation for Water for Irrigation in Nevada ("2006 Proof"). The Proof states that the point of diversion for the water rights is several miles downstream from Great Basin National Park and the Snake Creek Pipeline, and the method of diversion is "through ditches." That the Proof does not reference, describe, or mention the Snake Creek Pipeline in any way, Defendants argue, is evidence that Plaintiffs' Utah water rights do not confer a right to the water in the Pipeline. Defendants argue this is further supported by the fact that the 1987 Water Right Assessment did not mention the Snake Creek Pipeline or any water right by the Plaintiffs to the portion of Snake Creek located within the Park. Defendants argue that none of the cases cited by Plaintiffs support the sweeping claim that the existence of a downstream water right creates an enforceable, permanent right-of-way throughout the entirety of the stream channel. Defendants argue such a principle would be unworkable – creating, for instance, the possibility that a water right diverted from the Colorado River near Las Vegas could, by extension, confer a permanent right-of-way within Rocky Mountain National Park in Colorado, solely because the Colorado River's headwaters arise in Colorado.

Next, Defendants argue that the Pipeline does not come within the ambit of the 1891 Act, as that law granted rights-of-way only to "canals, ditches, or reservoirs." Because pipelines are not mentioned in the 1891 Act, Defendants argue that the 1891 Act does not create a right-of-way to the Snake Creek Pipeline for Plaintiffs. Further, Defendants argue that even if pipelines were covered under the Act, no right-of-way in the Snake Creek Pipeline would have vested, because under the terms of the Act, an applicant had to file a map of the "canal or ditch, or reservoir" with the Interior Department. Because Plaintiffs never filed such a map, and the Interior Department never approved any right-of-way to the Pipeline, Defendants argue Plaintiffs do not have a right-of-way to the Pipeline under the 1891 Act. Defendants ask this Court to reject the vesting-by-construction interpretation of the Act.

Finally, even if a right-of-way for the Pipeline were ever perfected, Defendants argue there is no evidence in the record to establish that Plaintiffs are successors-in-interest to any such right.

Defendants argue the undisputed facts show that the Pipeline was constructed in 1962 by the Snake Creek Irrigation Company – an entity that is not a party to suit and that no longer exists. Further, both the 1962 and 1978 Special Use Permits provide that the Snake Creek Irrigation Company's rights were non-transferrable. Defendants argue that the Pipeline is currently exclusively owned by the United States, because the 1978 permit provided that if the permittee failed to remove any improvements "within a reasonable period" after termination of the permit, the improvements would become federal property. Because the last permit expired on February 28, 1986 and no subsequent permit was issued by the Forest Service or the NPS, Defendants contend the Pipeline is currently under the exclusive ownership of the federal government.

a)   No Right-of-Way under the 1866 Act

The Court first addresses whether the 1866 Act confers upon Plaintiffs a right-of-way to the Snake Creek Pipeline within Great Basin National Park.

The 1866 Act states, in relevant part, that:

> Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed . . . .

> Act of July 26, 1866, ch. 262, § 9, 14 Stat. 253 (codified at 43 U.S.C. § 661) (emphasis added).

The 1866 Act recognized water rights and rights-of-way only on public lands – not on lands reserved or withdrawn from the public domain. See United States v. McIntire, 101 F.2d 650, 654 (9th Cir. 1939) (citations omitted). Thus, the relevant period for the applicability of the 1866 Act is during the period from 1866 to 1909, as the underlying lands were withdrawn from the public domain and incorporated into the Nevada National Forest in 1909. In other words, for Plaintiffs to have secured a water right or right-of-way that could be acknowledged by the 1866 Act, it would have had to have occurred between 1866 and 1909.

The 1866 Act contained two important features. First, it granted protections to parties whose rights to the use of water "for mining, agricultural, manufacturing, or other purposes" were established "by the local customs, laws, and the decisions of courts." This provision "embraces the doctrine of prior appropriation and a general policy of deference to state and local law regarding water rights." W. Watersheds Project v. Matejko, 468 F.3d 1099, 1103 (9th Cir. 2006). In other words, whether a private water right existed on federal lands under the 1866 Act was determined "by state and local law and custom." Andrus v. Charleston Stone Prods. Co., Inc., 436 U.S. 604, 614 (1978).

Second, it acknowledged and protected any existing rights-of-way over federal lands for the purpose of diverting the water via "the construction of ditches and canals." United States v. Estate of Hage, 810 F.3d 712, 717 (9th Cir. 2016) (quoting Hunter v. United States, 388 F.2d 148, 154 (9th Cir. 1967)). Though Congress referred only to rights-of-way over "ditches and canals," the Ninth Circuit has recognized that the 1866 Act does not limit rights-of-way to only those two categories of water conveyance. Instead, rights-of-way under the 1866 Act could equally apply to other types of structures "constructed for the storing and transmission of the water itself," including "reservoirs, dams, canals, ditches, flumes, pipes and tunnels." Hunter, 388 F.2d at 154 (quoting Utah Light & Traction Co. v. United States, 230 F.343, 345 (8th Cir. 1967)). Like the scope of water rights, the scope of rights-of-way over federal land for the construction of water conveyances was also determined by reference to state law and custom. Jennison v. Kirk, 98 U.S. 453, 456-60 (1878) (stating that the "right-of-way" clause of the 1866 Act did not confer an absolute right-of-way for the holders of water rights, but only confirmed and acknowledged such rights-of-way as state law or custom had already established); Utah Power & Light Co. v. United States, 243 U.S. 389, 402 (1917) (stating that under the 1866 Act, "rights of way on the public land for the storage and conveyance of water can be acquired under the local customs, laws and decisions of courts without the permission of the Secretary of the Interior").

By its own terms, then, the 1866 Act distinguishes between the possession of a water right and the possession of a right-of-way (or easement) over public land to construct or maintain a water conveyance. This statutory distinction comports with the well-established principle that "the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

right to convey water is distinguishable from the right to use water." James H. Davenport, Nevada Water Law, at 132 (citing Barnes v. Sabron, 10 Nev. 217 (1875)); see also Hage v. United States, 51 Fed. Cl. 570 (Fed. Cl. 2002) (distinguishing between water rights and ditch rights-of-way); Utah Power & Light Co., 243 U.S. 389 (1917) ("This is not a controversy over water rights but over rights of way through lands of the United States, which is a different matter and is so treated in the right-of-way acts before mentioned."); Snyder v. Colorado Gold Dredging Co., 181 F.62, 699 (8th Cir. 1910) ("The right to appropriate the waters of a stream does not carry with it the right to burden the lands of another with a ditch for the purpose of diverting the waters and carrying them to the place of intended use, for that cannot be done without a grant from the landowner . . . and this although the particular circumstances be such that the proposed appropriation cannot be effected without the ditch."). Thus, the Court must determine not only whether Plaintiffs have a vested water right in the upstream portion of Snake Creek, but also whether Plaintiffs have a right-of-way or easement over the water conveyance itself – i.e., over the Snake Creek Pipeline. See Cupps v. Pioneer, 2017 U.S. Dist. LEXIS 236974, at *10 (D. Wyo. Oct. 9, 2017) ("For a right-of-way to vest under the 1866 Act, the prospective grantee must possess valid water rights under state law, and the water facilities had been constructed on unoccupied and unreserved public lands." (emphasis added) (citing Bear Lake, 164 U.S. at 16-19)). Both of these interests must be established for Plaintiffs' quiet title claim to succeed.

The Court first finds that the undisputed evidence in the record supports Plaintiffs' argument that the scope of their vested water right includes the upstream portion of Snake Creek within the Park. As stated above, under the terms of the 1866 Act, the federal government must recognize a water right that vested and accrued in accordance with "local customs, laws, and the decisions of courts" prior to the withdrawal of the underlying lands from the public domain. Before 1909, the doctrine of prior appropriation controlled the governance of water rights in Nevada. See Reno Smelting, Milling & Reduction Works v. Stevenson, 21 P. 317, 322 (1889) (affirming that prior appropriation was the prevailing doctrine in Nevada); accord Mineral Cty. v. Lyon Cty., 473 P.3d 418, 423 (Nev. 2020) (discussing history of prior appropriation doctrine in Nevada); cf. Diamond Valley Ranch, at *12-13 (stating that the Nevada state legislature "may create a

regulatory scheme that modifies the use of water appropriated <u>after 1913</u> in a manner inconsistent with the doctrine of prior appropriation"). The doctrine of prior appropriation "grants an appropriative right [that] may be described as a state administrative grant that allows the use of a specific quantity of water for a specific beneficial purpose if water is available in the source free from the claims of others with earlier appropriations." <u>Mineral Cty. v. Lyon Cty.</u>, 473 P.3d 418, 423 (Nev. 2020) (internal quotation marks omitted). To constitute a valid appropriation of water, the party claiming a vested right must show "an actual diversion . . . with intent to apply it to a beneficial use, followed by an application to such use within a reasonable time." <u>Walsh v. Wallace</u>, 67 P. 914, 917 (Nev. 1902). Irrigation has long been viewed as a beneficial use under state law. See <u>Ennor v. Raine</u>, 74 P. 1, 1 (Nev. 1903).

It is undisputed that since at least 1880, Plaintiffs have put the waters of Snake Creek to beneficial use to irrigate their lands in Millard County, Utah. The extent of Plaintiffs' beneficial use was not limited to any particular portion of Snake Creek. In 1910, a Utah court decreed that Plaintiffs, "for a period of more than thirty years last past, have had the open, uninterrupted, [and] exclusive, use and enjoyment, of <u>all the waters of the Creek commonly known as Snake Creek</u>." ECF No. 48-5 (emphasis added). Thus, by its plain terms, the Decree acknowledged Plaintiffs' appropriation of waters within the whole of Snake creek. The court went on to acknowledge that Snake Creek "is a natural stream of water . . . which raises in the mountains commonly called the Snake Range . . . in the State of Nevada, and flows in an easterly direction in a natural and well defined channel into Millard County, Utah, and there applied by plaintiffs to irrigate about 620 acres of land." <u>Id.</u> The court thus acknowledged that Snake Creek's headwaters arose in Nevada, but declined to impose any limitation upon Plaintiffs' right to upstream waters across state lines.

Furthermore, that Plaintiffs' water rights were adjudicated in Utah – rather than in Nevada – is of no moment. In 1907, the Ninth Circuit reviewed a quiet title action initiated in the District of Nevada involving a stream channel that crossed from Nevada into California. See <u>Rickey Land & Cattle Co. v. Miller & Lux</u>, 152 F. 11 (1907). In evaluating the application of the doctrine of prior appropriation across state lines, the circuit court observed as follows:

The right of appropriation is recognized in law, which means the right of diversion and use. It is the right, not to any specific water, but to some definite quantity of that which may at the time be running in the stream. So the right acquired by an appropriation includes the right to have the water flow in the stream to the point of diversion. <u>The fact of a state line intersecting the stream does not, within itself, impinge upon the right</u>. In other words, the appropriation may still be acquired although the stream is interstate and not local to one state; <u>nor will the mere fact that the stream has its source in one state authorize a diversion of all the water thereof as against an earlier and prior appropriator across the line in another state</u>. <u>On the contrary, one who has acquired a right to the water of a stream by prior appropriation, in accordance with the laws of the state where made, is protected in such right as against subsequent appropriators, though the latter withdraw the water within the limits of a different state.</u>

<u>Id.</u> at 18 (emphases added).

The Ninth Circuit's observations in <u>Rickey Land</u> thus instruct that where a party has acquired the right to the use of certain waters by prior appropriation, as is the case with the Snake Creek Plaintiffs here, that right is not limited merely because the stream channel happens to cross state lines.

Nor does the Court find that Plaintiffs' water rights are defined based on the point of diversion, as Defendants suggest. Defendants argue that the point of diversion for Plaintiffs' water rights on Snake Creek are in Utah – not Nevada – and thus, this must mean that Plaintiffs' water rights are limited to the water that flows from that point of diversion in Utah. But Defendants provide no legal authority to support the notion that the doctrine of prior appropriation restricts water rights based on a point of diversion; nor has this Court identified any such authority. Furthermore, the evidence in the record is contrary to Defendants' argument. The Nevada State Engineer has implicitly recognized that Plaintiffs possess water rights to Snake Creek in Nevada – rights which are in no way cabined by the point of diversion located in Utah. In 2010, the Nevada State Engineer issued a ruling "In The Matter of Application 70829 Filed to Appropriate the Public Waters of Gruden Springs Within the Snake Valley Hydrographic Basin (195), White Pine County, Nevada" (the "Gruden Springs decision"). ECF No. 48-10. That matter involved an application by

a third party, Donald A. Duff, to appropriate water from Gruden Springs – a water channel located in Nevada. Baker Ranches, Inc. – one of the Snake Creek Plaintiffs in the instant action – objected to Duff's application on the grounds that Gruden Springs is a tributary to Snake Creek, and that any diversion from Gruden Springs in Nevada would have a negative downstream impact on the flow of water to Plaintiff's lands in Utah. The Nevada State Engineer, citing the Snake Creek Decree, agreed with Plaintiff, finding that "Gruden Springs historically did flow into Snake Creek and water from the spring cannot be appropriated in the manner sought by the Applicant." Id. at 4. Thus, the Nevada State Engineer's Gruden Springs decision recognized that an upstream water diversion on Snake Creek in Nevada could not be approved where it would impact Plaintiff's downstream water rights in Utah, irrespective of whether the upstream diversion sits in a different state, and without reference to the downstream rights-holder's point of diversion.

Having established that Plaintiffs have a vested water right in Snake Creek arising from its headwaters, the Court next addresses whether Plaintiffs also have a right-of-way or easement within the Park that would permit them to maintain and repair the water conveyance (the Snake Creek Pipeline). As stated above, in addition to recognizing water rights vested and accrued in accordance with state law, the 1866 Act also recognized rights-of-way for the construction of water conveyances on federal lands, as established under "local customs, laws and decisions of courts." 43 U.S.C. § 661; Utah Power & Light Co., 243 U.S. at 402. The scope of any easement or right-of-way for the construction of water conveyances is thus also determined by reference to state law. Elko Cty. Bd. of Supervisors, 909 F. Supp. at 763 (citing Jennison, 98 U.S. at 457-58).

The Court finds that Ennor v. Raine, 74 P. 1 (Nev. 1903), sets forth the applicable state law governing the scope of any right-of-way or easement associated with a water right. In Ennor, the Nevada Supreme Court contemplated the case of a landowner and his neighbor, both of whom had claims to the use of water flowing within a particular water channel. The landowner possessed lands upstream from the neighbor and constructed several dams on his property that obstructed downstream water flow to the neighbor's ranch. 74 P. at 1-2. To deal with his downstream water loss, the neighbor entered onto landowner's land and tore out the dams. Id. The landowner sued the neighbor for trespass. Id. In finding for the neighbor, the Nevada Supreme Court observed that

the neighbor had been using the water flowing through the landowner's property for over twenty years prior to the construction of the landowner's dams, that the neighbor was the prior appropriator of the water within the channel, and that he was therefore entitled to an easement over the landowner's property for the limited purpose of removing the obstructions "to the extent necessary to allow his water to flow for the proper irrigation of his crops." 74 P. at 2. The court issued the following holding with respect to the scope of rights-of-way:

> Since the passage of the act of Congress of July 26, 1866, c. 262, 14 Stat. 251 [U. S. Comp. St. 1901, p. 1437], the prior appropriator is entitled to a right of way for conveying his water along its natural channel, and through ditches constructed prior to the time that other rights attached to the land traversed by these water courses. All locators, patentees, owners, and claimants whose rights are initiated after the appropriation of the water hold subject to this easement. (Hobart v. Ford, 6 Nev. 77; Shoemaker v. Hatch, 13 Nev. 261.) The defendant being the appropriator and owner of the water, as was properly alleged as a defense in the answer, and as appears to have been found by the jury, he was as much entitled to have it flow through the [landowner's] ranch in the natural channel, and in ditches used by him or his grantors prior to the location of that place, as through his own lands, and had as much right to remove dams and obstructions on the [landowner's] ranch to the extent necessary to allow his water to flow for the proper irrigation of his crops as he had to remove dams on his own ranch or obstructions in his own lane or doorway, provided he did so peaceably.

> Id. (emphases added).

The above language reveals that the Ennor court identified two circumstances under which a right-of-way or easement may exist under state law for a prior appropriator to safeguard his water rights: (1) where a prior appropriator's water runs through a "natural channel" upstream from the site of his water usage, he has a limited right-of-way to maintain the water flow through that channel; and (2) where a prior appropriator constructed "ditches" before the underlying lands became subject to another property right, the prior appropriator has a limited right-of-way to maintain that ditch to the extent necessary to safeguard his downstream water right.

The Court finds that the first type of right-of-way contemplated by Ennor – the right-of-way to maintain water flow through the "natural channel" of a creek – is neither recognized under the 1866 Act, nor applicable to the facts of this case. By its plain terms, the 1866 Act provides

- 26 -

rights-of-way only "for the construction of ditches and canals" – it does not provide for rights-of-way to natural channels of water. 43 U.S.C. § 661; see also Utah Power & Light Co., 243 U.S. at 402 (stating that the 1866 Act recognized "rights of way on the public land for the storage and conveyance of water"). Though the 1866 Act secured water rights and rights-of-way by reference to state law, Jennison, 98 U.S. at 456-60, it did not provide for the state law of easements to entirely displace the language of the 1866 Act itself. "To the extent state law is borrowed" in the course of interpreting a federal statute, "it must be in service of federal policy or functions, and cannot derogate from the evident purposes of the federal statute." S. Utah Wilderness Alliance v. BLM, 425 F.3d 735, 763 (10th Cir. 2005) (discussing another 1866 right-of-way statute that governed easements over federal land for the construction of highways). Because the plain language of the 1866 Act does not reserve rights-of-way to maintain a natural water channel, but only to construct and maintain an artificial water structure (such as a ditch or canal), Plaintiffs have no right-of-way to access the natural channel of Snake Creek itself. See Caldwell v. United States, 250 U.S. 14, 21 (1919) (stating that statutes granting rights-of-way on public lands "are to be strictly construed," such that "nothing passes but what is conveyed in clear and explicit language – inferences being resolved not against but for the Government").

Though this conclusion might appear inconsistent at first blush, the Court finds logical support for it in the history of the Act's passage. In Jennison v. Kirk, the Supreme Court discussed at length the historical context and legislative history of the 1866 Act. 98 U.S. 453 (1878). The Court explained that at the time the 1866 Act was passed, Congress was concerned with protecting investments in the construction of ditches, canals, and other water conveyances in the American West, as such structures were imperative to the mining operations that contributed to settlement and development of the area. Id. at 456-60. Congress recognized that mining operations required that "the waters of rivers and lakes [be] carried great distances in ditches and flumes, constructed with vast labor and enormous expenditures of money," and that the western states and territories, looking to protect miners' investments, adopted "numerous regulations . . . for the security of these ditches and flumes." Id. at 458. As such, Congress intended for courts interpreting the 1866 Act to look to local custom, law, and decisions "for the purpose of securing . . . rights of way over the

public lands to convey [water]," and "not to grant rights of way where they were not previously recognized by the customary law of miners." <u>Id.</u> at 459. <u>Jennison</u> thus recognized that the 1866 Act's grants of rights-of-way were intended to confirm the existing state law of easements over ditches, canals, and other similar water conveyances – in other words, over the artificial structures that miners had invested money and labor into constructing for the transportation of water, pursuant to existing state customs and regulations. The Supreme Court again reaffirmed this reasoning in <u>Broder v. Water Company</u>, when it recognized that the 1866 Act "recognized and encouraged and was bound to protect" the "rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation, in the region where such artificial use of the water was an absolute necessity." 101 U.S. 274, 276 (1879). Building on these cases, the Ninth Circuit has noted that the 1866 Act's reference to "ditches and canals" is "specific and there is no other language that suggests the public lands are to be encumbered by additional or other easements." <u>Hunter</u>, 388 F.2d at 154.

This Court thus concludes that, based on the plain language of the statute and the controlling precedents cited above, the 1866 Act does not contemplate a right-of-way over a natural channel, even when such right-of-way exists under state law (as in <u>Ennor</u>). The 1866 Act was not concerned with protecting existing rights-of-way over natural channels of water, where no investment of construction was made, but was instead directed towards securing rights-of-way for the construction and maintenance of man-made water conveyances like ditches, canals, flumes, and pipelines, as such structures were imperative to westward expansion and development. <u>See also Bear Lake</u>, 164 U.S. at 10 (stating that under the 1866 Act, "no right or title to land, or to a right of way over or through it" vests against the federal government unless "[]accompanied by the performance of labor thereon").

The Court further notes that, even if the 1866 Act contemplated rights-of-way on federal land to maintain a "natural channel" of water, this would not grant Plaintiffs a right-of-way under the facts of this case, because the right-of-way sought here is not over a natural channel, but over a pipeline. Plaintiffs appear to argue that because the Pipeline sits in Snake Creek, it is necessarily part of the "natural channel" of the creek, and thus, they have a right-of-way to the Pipeline under

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ennor's "natural channel" theory of easements. This argument misconstrues the law. The Nevada Supreme Court has distinguished between man-made conveyances of water and the natural channel of water that flows without any artificial supportive structure. See Kent v. Smith, 140 P.2d 357, 360 (Nev. 1943) ("We do not agree with respondent that there is a natural channel leading from the point where the Wilcox dam was constructed to the Outside Slough. That connection is by means of a man-made ditch, and its construction would, of course, have been unnecessary if there had been a sufficient confluence to permit sufficient water to flow into the Outside Slough to meet existing demands."); see also Hunter, 388 F.2d at 154 (describing "reservoirs, dams, canals, ditches, flumes, pipes and tunnels" as facilities "constructed for the storing and transmission of the water itself"). It is undisputed that the Pipeline is a man-made supportive structure, constructed to prevent water from seeping into a "losing reach" of the creek. Thus, it is not a "natural channel" to which Plaintiffs would have a right-of-way under Ennor, even if the 1866 Act recognized the "natural channel" theory of easements.

Next, the Court finds that no permanent right-of-way or easement on the Pipeline exists under the second set of circumstances contemplated by Ennor – where a "ditch [was] constructed prior to the time that other rights attached to the land traversed by [the relevant] water courses." 74 P. at 2. The Court first notes that Ennor speaks only of ditches – it does not mention pipelines or other water conveyance structures, such as flumes, canals, tunnels, or the like. But even if the Ennor court meant to include pipelines or other water transportation facilities in their recognition of rights-of-way, it is clear that the court only intended to confer rights-of-way upon those conveyances that were constructed "prior to the time" that other competing rights attached to the underlying lands. Id. Here, it is undisputed that the water conveyance at issue – the Pipeline – was constructed in 1962, well after the underlying lands became federal property with the establishment of the Nevada National Forest in 1909. Thus, there is no recognized right-of-way to the Pipeline under state law.

Looking beyond Ennor, Plaintiffs also raise several other arguments to support the finding of a right-of-way or easement on the Pipeline under state law, none of which the Court finds persuasive. First, Plaintiffs seem to suggest that the Pipeline constitutes a development upon the

stream's natural channel or on a preexisting ditch, such that an established right-of-way to the Pipeline could relate back to some date before 1909. They specifically argue that "any water saved through the improvement of the diversion (i.e. construction of a pipeline or the concrete lining of an earthen ditch) inures to the benefit of the appropriator." ECF No. 51 at 21. However, Plaintiffs fail to cite to any Nevada state law decision or other binding authority to support this argument. The Court also finds there to be no evidence in the record of a relationship between any preexisting ditch and the placement of the Pipeline, such that a right-of-way to the Pipeline could be found in a ditch that was constructed in the same location prior to 1909. Notably, while the 2006 Proof states that the method of diversion of Plaintiff's water has historically been "through ditches" located in Snake Creek, the Proof does not indicate when these ditches were constructed, or what relationship they bear – if any – to the Pipeline. In short, there is no evidence of chain of title or other documentation that would indicate that the Pipeline was somehow related to an earlier ditch that predated the withdrawal of the underlying lands from the public domain, such that a reasonable factfinder could infer that there is a succeeding right-of-way to the Pipeline.

Plaintiffs also unconvincingly argue that state law provides that the Pipeline could pass as an appurtenance to either their vested water rights, or to their real property interests downstream in Millard County, Utah. Plaintiffs cite two Nevada Supreme Court cases in support of this argument: Snow v. Pioneer Title Ins. Co., 444 P.2d 125 (Nev. 1968), and Marlette Lake Co. v. Sawyer, 383 P.2d 369, 370 (Nev. 1963). Snow was a title insurance dispute in which the court considered whether the owner of one property had the right to take underground water through a well located on an adjoining property. The two properties had once been joined as a single parcel. 444 P.2d at 125. Looking to the express terms of the parties' dissolution agreement, the court in Snow concluded that the parties had intended for the property at issue to continue to receive water from the adjoining property following the division of the parcels. Id. at 128. Snow thus did not consider the status of a Pipeline constructed on reserved federal lands, but instead contemplated the express transfer of a pipeline as a named appurtenance to real property based upon an agreement between two private property owners. Marlette is similarly inapplicable. There, the court rejected a state constitutional challenge to the Nevada state legislature's authorization of a

particular water rights purchase. The water rights sale included an express provision that the sale would include "land, easements, pipelines, flumes, and . . . other fixtures and appurtenances" related to the water right. 383 P.2d at 337. In short, Snow and Marlette are both factually and legally distinguishable from the case at hand. Both cases involved the sale of real property pursuant to written conveyances, which expressly contemplated the transfer of a pipeline. Neither case stands for the proposition that a pipeline constructed on occupied and reserved federal lands and untethered to any privately-held real property, can implicitly pass as an appurtenance to real property located in another state, or as an appurtenance to vested water rights – particularly where there exists no evidence of chain of title or actual ownership of the pipeline.

Finally, the Court rejects Plaintiffs' argument that another state law case, Steptoe Live Stock Co. v. Gulley, 295 P. 772 (Nev. 1931), supports the finding of an easement over the Pipeline under the 1866 Act. Plaintiffs argue that Steptoe teaches that, under state law, "a water appropriator need not construct anything in order to perfect an 1866 right-of-way." ECF No. 53, at 3. Plaintiffs isolate one sentence from the Steptoe decision to highlight this point: "While the right to thus appropriate the public waters of Nevada was recognized from the very earliest days, no specific method of appropriation was ever declared to be necessary, other than by putting it to an economical beneficial use." 295 P. at 774. Plaintiffs misconstrue Steptoe. Read in context, it is clear that the Steptoe court was referring to how a water right could vest – not how a right-of-way or easement could be established. In fact, the Steptoe decision does not discuss easements or rights-of-way at all. The Nevada Supreme Court, in recognizing that "no specific method of appropriation was . . . necessary," merely meant that a prior appropriator of water need not necessarily construct "ditches or artificial ways through which the water might be taken from the stream" in order to establish a "valid appropriation" and accompanying water right. Id. at 775. Steptoe has nothing to do with the establishment of rights-of-way or easements, and thus does not bear on how the Court is to understand the 1866 Act's grants of rights-of-way in this case.

In sum, based on the undisputed evidence in the record, the Court finds that while Plaintiffs have a vested water right in the upstream portion of Snake Creek, they have no established right-of-way or easement in the Snake Creek Pipeline under the terms of the 1866 Act.

### b)  No Right-of-Way under the 1891 Act

The Court next addresses whether a right-of-way to the Pipeline exists under the 1891 Act.

Sections 18 through 21 of the Act state as follows:

> Sec. 18. That the right of way through the public lands and reservations of the United States is granted to any canal ditch company, irrigation or drainage district formed for the purpose of irrigation or drainage, . . . which shall have filed, . . . with the Secretary of the Interior a copy of its articles of incorporation or, if not a private corporation, a copy of the law under which the same is formed and due proof of its organization under the same, . . . .; Provided, That no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation, and all maps of location shall be subject to the approval of the department of the Government having jurisdiction of such reservation . . . . [43 U.S.C. § 946.]
>
> Sec. 19. That any canal or ditch company desiring to secure the benefits of this act shall, within twelve months after the location of ten miles of its canal if the same be upon surveyed lands, and if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the officer, as the Secretary of the Interior may designate, of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way. . . . [43 U.S.C. § 947.]
>
> Sec. 20. That the provisions of this act shall apply to all canals, ditches, or reservoirs, . . . on the filing of the certificates and maps therein provided for. If such ditch, canal, or reservoir has been or shall be constructed by an individual or association of individuals, it shall be sufficient for such individual or association of individuals to file with the Secretary of the Interior, and with the officer, as the Secretary of the Interior may designate, of the land office where said land is located, a map of the line of such canal, ditch, or reservoir, as in case of a corporation, with the name of the individual owner or owners thereof, together with the articles of association, if any there be. . . . : Provided, That if any section of said canal or ditch shall not be completed within five years after the location of said section, the rights therein granted shall be forfeited as to any uncompleted section of said canal, ditch, or reservoir, to

the extent that the same is not completed at the date of the forfeiture. [43 U.S.C. § 948.]

Sec. 21. That nothing in this act shall authorize such canal or ditch company to occupy such right of way except for the purpose of said canal or ditch, and then only so far as may be necessary for the construction, maintenance, and care of said canal or ditch. [43 U.S.C. § 949.]

43 U.S.C. §§ 946-949.

As set forth above, the 1891 Act granted rights-of-way for "canals, ditches, or reservoirs" where several requirements had been met. These requirements included the filing of a map of the canal, ditch, or reservoir with the Interior Department, and "approval thereof by the Secretary of the Interior." 43 U.S.C. § 947. In addition, where the applicant for a right-of-way was a "canal ditch company, irrigation or drainage" district, the Act required that a copy of the company's articles of incorporation or the law under which it was organized also be filed. 43 U.S.C. § 946. If the applicant was an individual or group of individuals, the Act required that the name of the owners of the "canal, ditch, or reservoir" and any articles of incorporation be filed. 43 U.S.C. § 948. The effect of the 1891 Act was to provide "a method of acquiring a more extensive and secure" right-of-way or easement over water conveyances than was possible under the 1866 Act. Cupps v. Pioneer Canal-Lake Hattie Irrigation Dist., No. 2:16-cv-0086-SWS, 2017 U.S. Dist. LEXIS 236974, at *15 (D. Wyo. Oct. 9, 2017) (quoting Gila Water Co. v. Green, 232 P. 1016, 1018 (Ariz. 1925)). It did so, however, by imposing more rigorous "named conditions" upon those seeking to secure rights-of-way under the Act. Id. (quoting Rasmussen v. Blust, 122 N.W. 862, 864 (Neb. 1909)).

First, the Court rejects Defendants' argument that no right-of-way could have attached to the Pipeline under the 1891 Act because the Act refers only to canals, ditches, and reservoirs, and not pipelines. The 1891 Act's primary purpose was to provide for an irrigation right-of-way, and indeed, the Department of the Interior has granted irrigation rights-of-way over federal lands for the purposes of constructing pipelines. See Grindstone Butte Project v. Kleppe, 638 F.2d 100, 101-03 (9th Cir. 1981). Just as the 1866 Act's reference to "ditches and canals" does not limit rights-of-way to strictly those two water conveyances, see Hunter, 388 F.2d at 154, neither does the 1891

Act's reference to canals, ditches, and reservoirs preclude the finding of a right-of-way over a pipeline. See also Utah Light & Traction Co. v. United States, 230 F.343, 345 (8th Cir. 1915) (stating that the 1891 Act's reference to "ditches, canals, and reservoirs" is "broad enough to include dams, flumes, pipes, and tunnels as analogous or incidental to, and discharging the functions of, such reservoirs, ditches and canals").

However, the Court finds that Plaintiffs have no established right-of-way to the Pipeline under the 1891 Act because there is no evidence in the record that Plaintiffs or their predecessors satisfied the requirements imposed by the Act. Section 19 of the Act states that only "upon the approval thereof by the Secretary of the Interior" is the right-of-way recorded on government plats and the underlying land "subject to such right-of-way." Id. The Act thus expressly provided that approval of the Secretary was required for any right-of-way to vest. The Court further finds that the great weight of judicial authority interpreting the 1891 Act described these administrative filing and approval requirements as necessary prerequisites for the vesting of a right-of-way. See Utah Power & Light Co. v. United States, 243 U.S. 389, 406-07 (1917) (stating that the 1891 Act "call[ed] for the filing of maps of location which are to be effective and noted upon the public records when approved by the Secretary of the Interior"); Kern River Co. v. United States, 257 U.S. 147, 151 (1921) (stating that rights-of-way under the 1891 Act "were to be obtained by making application at the local land office and ultimately securing the approval by the Secretary of the Interior of a map of the ditch, canal or reservoir," and that the grant "was to become effective when the approval was given"); Western Watersheds Project v. Matejko, 456 F.3d 922, 926 (9th Cir. 2006) (stating that the 1891 Act "provided for a vested federal right-of-way for irrigation upon approval of a map by the Secretary of the Interior"). Here, it is undisputed that the Secretary of the Interior never approved Plaintiffs' right-of-way – what's more, there is no evidence in the record to suggest that Plaintiffs' predecessors ever filed a map of the Pipeline (or of any water conveyance within Snake Creek) with the Interior Department in the first place.

Plaintiffs concede that their predecessors never secured approval from the Secretary of the Interior for a right-of-way, but they argue that they are still entitled to a right-of-way to the Pipeline under the 1891 Act. They proffer the theory of "vesting by construction," whereby a right-of-way

may vest on unsurveyed public lands upon construction of a conveyance, rather than upon filing and approval of a map of the conveyance. Because the Pipeline was constructed on unsurveyed lands within the Humboldt National Forest, Plaintiffs argue that a right-of-way to the Pipeline vested upon construction of the Pipeline.

Plaintiffs argue that a basis for this "vesting-by-construction" theory exists in the Supreme Court's decision in Barlow v. Northern Pacific Railway Co., 240 U.S. 484 (1916). In that case, the Supreme Court reviewed the Act of March 3, 1875 ("1875 Act"), 18 Stat. 482 (codified at 43 U.S.C. §§ 934-939) (repealed Oct. 21, 1976). The 1875 Act provided that a railroad company could secure a right-of-way through federal lands by filing a map of the planned right-of-way with the local land office in advance of construction. In Barlow, the Supreme Court determined that despite the language of the 1875 Act, the railroad company could also acquire a right-of-way via construction of the railway. The Court reasoned that the statutory filing requirement "was intended not to deprive of the power to fix and secure the right of way by construction in advance of filing such map and profile, but simply to afford the means of securing the right of way in advance of construction." 240 U.S. at 485. The Supreme Court explained that "the two methods of securing the right, the one by construction, and the other in anticipation of construction by filing a map," did not conflict with each other, but simply provided "two means of securing the right which [the] statute gave." Id. Plaintiffs argue that because the filing requirement language in the 1875 Act and the 1891 Act are substantially the same, the Court should adopt the vesting-by-construction theory for the 1891 Act.

The Court rejects the vesting-by-construction theory urged by Plaintiffs. First, the Court notes that Plaintiffs have identified only two district courts cases in which this theory has been embraced – Roth v. United States, 326 F. Supp. 2d 1163 (D. Mont. Dec. 12, 2003), and Overland Ditch and Reservoir Company, No. 96-N-797, 1996 WL 33484927 (D. Colo. Dec. 16, 1996). Neither of these cases are binding upon this Court, and the Roth decision was also subsequently vacated upon the joint motion of the parties. See ECF No. 49-14. Moreover, the District of Colorado has since rejected the vesting-by-construction theory in its more recent decision of Pine River Irrigation District v. United States, 656 F. Supp. 2d 1298 (D. Colo. Sept. 18, 2009). The

Court agrees with the reasoning of the <u>Pine River</u> court, which rejected the premise "that the 1875 and 1891 Acts are nearly identical with respect to the grants of rights of way across federal lands." 656 F. Supp. 2d at 1319. In distinguishing the 1875 and 1891 Acts from each other, the <u>Pine River</u> court stated as follows:

> While Congress used similar language in both Acts to describe the process by which maps of claimed rights of way and other materials were to be filed with and approved by the Secretary of the Interior . . . it also added provisions to the 1891 Act that materially distinguish it from the 1875 Act. First, Congress added the proviso to the granting section of the 1891 Act, section 18, that expressly requires federal executive approval as a precondition to a right of way grant over reserved and withdrawn federal lands, and imposes a duty on the relevant federal executive to determine whether use of the right of way will interfere with the federal government's occupancy of these lands. . . . Second, in amending the 1891 Act in 1898, Congress stated that rights of way established under the 1891 Act are "approved." 1898 Amendment (43 U.S.C. § 951). The 1875 Act and the legislation related to it contain no such language. These differences go directly to the question of whether Congress intended to condition the grant of rights of way under the 1891 Act on the Department of the Interior and other federal government approval of the grant, and indicate this was Congress' intent. Accordingly, reliance on the Supreme Court's decisions in <u>Barlow</u> and <u>Jamestown</u> concerning the means by which railroad rights of way may be acquired under the 1875 Act is misplaced.

656 F. Supp. 2d at 1319-20.

The Court agrees with the <u>Pine River</u> court that these two distinctions are crucial and militate against applying the vesting-by-construction theory to the 1891 Act for irrigation rights-of-way. The Court finds particularly important the fact that the 1875 Act did not include, as the 1891 Act does, a provision that "all maps of location shall be subject to the approval of the department of the Government," and that "no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation." <u>Compare</u> 43 U.S.C. § 934 <u>with</u> 43 U.S.C. § 946. This additional language, not found in the 1875 Act, indicates that Congress sought to empower the Secretary to determine whether a proposed irrigation right-of-way might interfere with the federal government's interest in the underlying lands – a consideration that is directly

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

contrary to the notion that a right-of-way could vest upon federal lands as soon as construction began.

The <u>Pine River</u> court also rightly rejected a second justification for the vesting-by-construction theory, which is similarly proffered by Plaintiffs here: that Congress could not have intended to provide no legal means of protecting an investment in the construction of water conveyances erected on unsurveyed public lands, pending the completion of the survey. As the <u>Pine River</u> court correctly noted, this rationale "runs afoul of the rule that statutes granting privileges or relinquishing rights of the public cannot be construed 'by reason and analogy' to the detriment of the public's rights," but instead, must be "strictly construed," with all grants to be "construed favorably to the government." <u>Id.</u> (quoting <u>Caldwell</u>, 250 U.S. at 21). The Supreme Court has stated that when construing federal rights-of-way statutes, "nothing passes but what is conveyed in <u>clear and explicit language</u> – inferences being resolved not against but for the government." <u>Caldwell</u>, 250 U.S. at 20 (emphasis added). The Court finds that the vesting-by-construction theory is not provided for in "clear and explicit language" in the 1891 Act. For that reason and the reasons stated above, the Court finds that the vesting-by-construction theory is inconsistent with the terms and purpose of the 1891 Act.

Because there is no evidence in the record that Plaintiffs or their predecessors-in-interest complied with the terms of the 1891 Act, the Court finds that the 1891 Act does not confer upon Plaintiffs a right-of-way to the Pipeline.

Accordingly, as the evidence in the record does not support Plaintiffs' argument that they possess a right-of-way onto federal lands to maintain the Snake Creek Pipeline under the 1866 or 1891 Acts, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' quiet title claims over Snake Creek, and denies Plaintiffs' Motion for Summary Judgment with respect to their quiet title claims over Snake Creek.

### 3.  Rights to Baker Creek

The Court next addresses whether the Baker Creek Plaintiffs have a right-of-way in Baker Creek that would permit them to engage in self-help to clear upstream obstructions within the Park. Plaintiffs argue that their right-of-way to clear obstructions in the creek was secured under the

1866 Act, because they have water rights to the creek under the doctrine of prior appropriation, and because their right-of-way to the creek was established under state law prior to the withdrawal of the underlying lands from the public domain.[4]

The Baker Creek Plaintiffs argue that they have a right-of-way or easement to Baker Creek, and that the Government is interfering with their vested right when it prevents them from removing debris or obstructions from the creek. As with their claims over Snake Creek, Plaintiffs rely on Ennor for the proposition that a prior appropriator is entitled to convey his water along the natural channel, and has the right to remove obstructions to the extent necessary to allow the water to flow unobstructed. Plaintiffs assert that the NPS knew about their prior appropriation of the waters of Baker Creek, and that their water rights do not begin at their points of diversion outside of the Park, but at Baker Creek's headwaters.

Defendants argue that Plaintiffs' downstream rights in Baker Creek do not create a right-of-way through upstream federal lands in the Park, particularly when there has been no construction of a ditch, canal, or water conveyance on Baker Creek. Defendants argue that Ennor is distinguishable, because it dealt with an intentional construction of permanent, unlawful diversions of natural streamflow by a private actor. By contrast, they argue, this case involves small rock dams created by Park visitors – not Defendants themselves – and is a dispute between downstream private property owners and upstream federal property owners.

The Court incorporates by reference its above-stated findings regarding the interpretation of the 1866 Act. The Court finds that under the 1866 Act, Plaintiffs have a right to the waters of Baker Creek, from its headwaters to its points of use downstream. It is undisputed that, pursuant to the Baker-Lehman Decree, the Baker Creek Plaintiffs possess water rights in Baker Creek with priority dates as early as 1872. As discussed above, under the doctrine of prior appropriation, Plaintiffs have the right to the continuous use of the water "to the full extent of [their] original appropriation and beneficial use." Barnes, 10 Nev. at 233. Plaintiffs thus have the right to the use

---

[4] Plaintiffs do not appear to assert a right-of-way to Baker Creek under the 1891 Act; nor could they, as they do not allege an easement over any ditch, canal, pipeline, or other water conveyance in the creek.

of the waters of Baker Creek to the extent provided for in the Decree. The Court finds no support in the law for the proposition that this usage is cabined to any particular part of the water channel as Defendants suggest.

With respect to whether a right-of-way exists within the Park, the Court agrees with Defendants and finds that Plaintiffs' water rights in Baker Creek do not give them a permanent easement in the Park under the 1866 Act. As stated above in the Court's analysis regarding Snake Creek, the 1866 Act only confers rights-of-way over ditches, canals, and other water conveyances constructed prior to the withdrawal of the lands from the public domain, and the scope of those rights-of-way are to be understood by reference to state law. Plaintiffs do not assert a claim over any such artificial structure – instead, they argue that under Ennor, they have a right-of-way to the natural channel of Baker Creek. They do not seek to clear obstructions from any preexisting ditch or water conveyance, but instead seek a right-of-way to clear debris from the creek channel itself. As stated in the preceding Snake Creek analysis, while Ennor provides a basis under state law for finding such a right-of-way on the private property of another, there is no authority that supports such a right-of-way on federal lands. The 1866 Act does not provide such a right-of-way on federal property withdrawn from the public domain.

The Court accordingly grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' quiet title claims over Baker Creek, and denies Plaintiffs' Motion for Summary Judgment with respect to their quiet title claims over Baker Creek.

Because the Court finds that Plaintiffs possess no right-of-way in either Snake or Baker Creek under the 1866 or 1891 Act, it also grants summary judgment in Defendants' favor with respect to Plaintiffs' claim under the Declaratory Judgment Act, as well as to Plaintiffs' claim for a writ of mandamus. See Shell Gulf of Mex., Inc. v. Ctr. For Biological Diversity, 771 F.3d 632, 635 (9th Cir. 2014) (stating that the Declaratory Judgment Act "does not create new substantive rights, but merely expands the remedies available in federal court"); Lights of America, Inc. v. United States Dist. Court, 130 F.3d 1369, 1371 (9th Cir. 1997) ("[C]ourts must possess an independent source of jurisdiction before entertaining a request for a writ of mandamus.").

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.  Claim 4: Trespass

The Court next addresses Plaintiffs' fourth claim for trespass.

Plaintiffs argue that Defendants are trespassing upon Plaintiffs' property by denying them the right to repair the Snake Creek Pipeline and to remove obstructions from Baker Creek. They allege that Defendants' actions constitute a trespass because they substantially reduce the flow of Plaintiffs' water. Defendants argue that Plaintiffs have no evidence that Defendants have invaded a property right, or that they have violated any duty owed to Plaintiffs.

"Trespass is an action for injury to plaintiff's possession." Rivers v. Burbank, 13 Nev. 398, 408 (1878). To sustain a trespass action, "a property right must be shown to have been invaded." Lied v. Clark County, 579 P.2d 171, 174 (Nev. 1978). In Nevada, civil trespass typically "consists of an unpermitted and unprivileged entry onto the land of another." Kim v. Wells Fargo Home Mortg. Inc., No. 2:10-cv-00593-GMN-RJJ, 2010 U.S. Dist. LEXIS 119839, at *13 (D. Nev. Nov. 9, 2010) (citing Allied Props. v. Jacobsen, 343 P.2d 1016, 1021 (Nev. 1959)). However, in the context of water rights, the Nevada Supreme Court has recognized that a trespass may occur where there is a "diversion of such a quantity of the water[] . . . as to substantially reduce the required flow" to the water-rights holder, or "the failure to exercise proper care in making [a] diversion, which . . . operates to cut off or reduce the required flow" to the water-rights holder. Schumann v. Martin, 302 P.2d 284, 285 (Nev. 1956).

The Court finds that there is no evidence in the record from which a reasonable factfinder could conclude that the NPS either diverted such a quantity of water as to substantially reduce the required flow to Plaintiffs' lands, or failed to exercise proper care in making such a diversion. There is no evidence in the record that NPS diverted water at all. Regarding Baker Creek, the undisputed evidence shows that the obstructions are formed by natural debris and small rock dams created by members of the public. It is not alleged that these obstructions were created by the Park Service or were a part of the Park Service's efforts to divert water from Plaintiffs' rightful appropriation. Moreover, there is evidence in the record that NPS employees took affirmative action in 2016 to remove the obstructions from the creek upon the request of Plaintiffs.

Regarding Snake Creek, there is no evidence in the record that NPS is diverting water from the Pipeline. Plaintiffs merely allege that the Pipeline is leaking water because NPS has not authorized Plaintiffs to make repairs. This does not constitute a "diversion" of water by NPS or a "failure to exercise proper care in making a diversion" on the part of Defendants.[5] Schumann, 302 P.2d at 285.

Plaintiffs' trespass claims thus fail as a matter of law. The Court accordingly grants Defendants' motion for summary judgment with respect to these claims.

## C.  Claim 5: Equitable Estoppel

Lastly, the Court turns to Plaintiffs' equitable estoppel claim.

Plaintiffs argue that the Government should be equitably estopped from denying Plaintiffs their rights to safeguard their water rights within Snake and Baker Creeks. They argue that their water rights long predate the Government's withdrawal of the lands through which Baker and Snake Creek flow, and that they have been exercising these rights during the entire existence of the Nevada National Forest and the Park. Defendants respond that there is no evidence that the Government ever represented to Plaintiffs that use of the Pipeline could continue without a permit or environmental review. They also argue there is no evidence that any of the Defendants made any representations regarding Plaintiffs' access to Baker Creek. Defendants also contend that Plaintiffs did not take any action in reliance on any promises made by the Government.

In general, equitable estoppel is not available against the government, "especially when the government is acting in its sovereign, as opposed to its proprietary, capacity." Johnson v. Williford, 682 F.2d 868, 871 (9th Cir. 1982). However, "where justice and fair play require it, estoppel will be applied against the government." Id. (internal quotations and citations omitted). For estoppel to apply, "the government's wrongful conduct must threaten 'to work a serious injustice' and the public's interest must not 'be unduly damaged by the imposition of estoppel.'" Id. (internal

---

[5] NPS's refusal to make repairs on the Pipeline pending a NEPA environmental review is also authorized under the Enabling Act's provision that "existing water-related range improvements inside the park may be maintained . . . subject to reasonable regulation by the Secretary." 16 U.S.C. § 410mm-1(g).

citations omitted). To prove estoppel, the following four elements must be established: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the facts; and (4) he must rely on the former's conduct to his injury. See id. at 872.

The Court finds that genuine issues of material fact exist that preclude granting summary judgment on Plaintiffs' estoppel claim. There are genuine issues of material fact regarding whether Defendants took any actions that would have put Plaintiffs sufficiently on notice of the fact that the Government challenged any right-of-way Plaintiffs asserted to the Snake Creek Pipeline and Baker Creek. The Court finds that there is some evidence that prior to the 2010s, Defendants had never questioned the Plaintiffs' actions with respect to the Pipeline or Baker Creek, leading Plaintiffs to believe that the Government recognized their rights-of-way.

With respect to Snake Creek, there is evidence in the record that Plaintiffs and their predecessors-in-interest accessed the Snake Creek Pipeline for years after their Special Use Permits expired in 1986, all with the NPS's knowledge. As stated earlier, the evidence suggests that Plaintiffs and their predecessors-in-interest regularly and continuously used the Pipeline with the NPS's direct knowledge up until 2016, including by conducting annual maintenance to the Pipeline. Further, on at least one occasion, the NPS deemed the Plaintiffs to be "responsible" for the Pipeline, and even advised them to make certain repairs and to install a security device on the Pipeline. Moreover, there is evidence in the record that the NPS at points requested Plaintiffs' permission and approval for access to the Pipeline: for example, in 2015 and 2016, the NPS diverted water from the Pipeline for research purposes and to kill non-native species of fish in Snake Creek, after first securing Plaintiffs' approval to access the Pipeline. From this evidence, a reasonable factfinder could conclude that the Government's actions signaled to Plaintiffs that the Government would not challenge Plaintiffs' claims over the Pipeline, and that Plaintiffs relied on this implicit assurance to their detriment.

With respect to Baker Creek, there is evidence in the record that Plaintiffs were at one time permitted to clear debris from the creek. In 2012, Craig and Dave Baker were removing a man-

made dam found within Baker Creek that completely diverted water flow. They were initially detained by NPS law enforcement and taken to Park headquarters to meet with the Superintendent, but were subsequently permitted to remove the remainder of the man-made dam and to redirect water flow down the natural stream channel of Baker Creek. Two years later, a new Superintendent of the Park, Steve Mietz, informed the Plaintiffs that they would no longer be allowed to remove obstructions from Baker Creek and that doing so would result in citations or fines. Plaintiffs attest that because the Government never, until recently, questioned their water rights or rights-of-way in the Park, the have continued to invest in and improve their irrigated lands.

The Court finds that the above constitutes sufficient evidence in the record from which a reasonable factfinder could conclude that the federal government knew Plaintiffs claimed rights-of-way to Snake and Baker Creeks, that they permitted Plaintiffs to access the Snake Creek Pipeline and Baker Creek based on this understanding, and that Plaintiffs relied on the Government's silence to their detriment. The Court accordingly denies summary judgment with respect to Plaintiffs' claim for equitable estoppel.

## VI.    CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment [ECF No. 48] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 49] is **GRANTED** in part and **DENIED** in part. The motion is granted with respect to Plaintiffs' first, second, third, and fourth claims for relief. The motion is denied with respect to Plaintiffs' fifth claim for relief.

**IT IS FURTHER ORDERED** that the parties shall submit a proposed joint pretrial order for a bench trial by September 23, 2022.

DATED: September 1, 2022

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

- 43 -