**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

BAKER RANCHES, INC., *et al*.,

Plaintiffs,

v.

RYAN ZINKE, *et al*.,

Defendants.

Case No. 3:18-cv-00261-RFB-CLB

**ORDER**

This case came before the Court for trial commencing on February 10, 2025. The Court heard evidence during the four-day bench trial, and the parties submitted trial briefs and proposed Findings of Fact and Conclusions of Law. After hearing all the evidence, legal submissions and arguments of the parties, the following Findings of Fact and Conclusions of Law are entered.

**I.      PROCEDURAL HISTORY**

Plaintiffs filed suit in federal court on June 5, 2018. See ECF No 1. On February 26, 2019, Plaintiffs filed an Amended Complaint, which is the operative complaint. See ECF No. 30. The Amended Complaint asserts five claims for relief: (1) quiet title under the Quiet Title Act, 28 U.S.C. §§ 1346f and 2409a; (2) declaratory judgment under 28 U.S.C. § 2201 to a recognized right-of-way or easement across United States National Park Service lands; (3) a writ of mandamus under 28 U.S.C. § 1361 compelling the defendants to provide a right-of-way or easement across National Park Service lands; (4) trespass; and (5) equitable or promissory estoppel. Id.

The parties filed stipulated findings of fact on September 25, 2019, ECF No. 47, which was signed by the Court on October 22, 2019. ECF No. 50. The parties each filed Motions for Summary Judgment on October 21, 2019. ECF Nos. 48, 49. The parties responded to the cross motions on November 27, 2019, ECF Nos. 51, 52, and replied on December 20, 2019, ECF Nos. 53, 54. A hearing was held on November 25, 2020. ECF No. 56. On September 1, 2022, the Court

denied the Plaintiffs' Motion for Summary Judgment and granted in part and denied in part the Defendants' Motion for Summary Judgment. ECF No. 57. Specifically, the Court entered summary judgment in Defendants' favor on Plaintiffs' first four claims. Id. Plaintiff's fifth claim for equitable or promissory estoppel was allowed to proceed. Id.

On July 5, the parties filed their Joint Pretrial Order, see ECF No. 76, which was denied, see ECF No. 77. On April 22, the parties filed another Joint Pretrial Order. ECF No. 80. Then on July 11, 2024, Plaintiffs filed a request for the Court to take judicial notice of legislative files related to the Great Basin National Park Act, Public Law 99-565, found in the National Archives. ECF No. 81. The Defendants opposed the request on July 18, 2024, see ECF No. 89, and Plaintiffs filed a reply on August 8, 2024, see ECF No. 92. Plaintiffs also filed a notice of in camera submission. ECF No. 93. In response, on August 16, Defendants filed an unopposed motion for leave to file sur-reply. ECF No. 94.

On January 3, the parties filed a Second Joint Proposed Pretrial Order. ECF No. 97. Plaintiffs filed their exhibit list, see ECF No. 99, their witness list, see ECF No. 101, their proposed findings of fact, see ECF No. 102, and their trial brief, see ECF No. 103. Defendants filed their trial brief as well. ECF No. 100. On January 16, Defendants filed a motion for leave for a witness to testify by remote means and a motion to admit a government attorney. ECF Nos. 105. These motions were both granted. ECF Nos. 107, 108. On February 4, Plaintiffs submitted deposition transcripts. ECF No. 109.

On January 6, the parties filed a Third Joint Proposed Pretrial Order. ECF No. 110. The Court held the bench trial from February 10−13. ECF Nos. 111−114. Plaintiffs called seven witnesses during their case in chief: Tom Baker, Christopher Wheeler, Craig Baker, Peter Fahmy, Eric Lord, Ben Roberts, and Steven Mietz. Defendants called three witnesses during their case in chief: Ben Roberts, James Woolsey, and Steven Mietz. The Court incorporated into evidence excerpts of deposition testimony of Bruce Freet, Philip Gardner, Daisy Gonder, Owen Gonder, Albert Hendricks, Jonathan Reynolds, Nathan Snyder, and Darwin Wheeler. During the last day of the bench trial, the Court denied Plaintiffs' Request for Judicial Notice. The Court then entered the trial exhibit and witness list. ECF No. 115.

On February 18, Defendants filed a Motion to Strike, which was briefed by February 24. ECF Nos. 116, 117. On March 30, the Court issued a Minute Order denying the Motion for Leave to File Sur-Reply as moot. ECF No. 122. On April 3, Plaintiffs filed a motion for leave to file excess pages. ECF No. 123. The next day, Defendants filed their post-trial brief. ECF No. 124. They also filed their proposed findings of fact. ECF No. 125. The same day, Plaintiffs filed their post-trial brief and proposed findings of fact. ECF Nos. 126, 127. On April 24, the parties filed a joint proposed site inspection itinerary. ECF No. 128. On May 2, the Plaintiffs responded to Defendants' post-trial brief, and the Defendants responded to Plaintiffs' post-trial brief. ECF Nos. 129, 130. Defendants also filed a notice of corrected image. ECF No. 131. On May 7, Plaintiffs filed a motion to strike, which was briefed by May 28. ECF Nos. 132, 134, 135. They also filed an *errata* to the proposed findings of fact. ECF No. 133. On June 5, the Court granted, *nunc pro*, Plaintiff's motion for leave to file excess pages for their Proposed Findings of Fact and Conclusions of Law. ECF No. 136.

On June 24 and June 25, the Court engaged in a Site Visit to Baker, Nevada and Great Basin National Park in order to observe various sites in dispute in this case regarding the Baker Creek system, the Snake Creek system, and the Snake Creek pipeline. During a hearing, the Court identified the twenty locations that the Court and the parties visited during the Site Visit. ECF Nos. 138, 139. On June 30, Defendants filed an Amended Exhibit List. ECF No. 137. On July 1, Plaintiffs filed a Request for Judicial Notice, which was briefed by July 14. ECF Nos. 140, 141, 143. On July 9, Defendants also filed an Amended Exhibit List. ECF No. 142. On August 5, the Court held a status conference.

Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law.

## II.  FACTUAL FINDINGS

The Court makes the following findings of fact based upon the evidence presented.

### A.  The Parties

Great Basin National Park [hereinafter "the Park"] was established on October 27, 1986,

by Public Law 99-565 [hereinafter "the Enabling Act"]. The land comprising the Park was previously managed by the United States Forest Service as part of the Nevada National Forest, which was withdrawn from the public domain and created on February 10, 1909. The Nevada National Forest was incorporated into the Humboldt National Forest on October 1, 1957. The Park also includes the former Lehman Caves National Monument, which was established on January 24, 1922.

The Park's natural resources include populations of elk, mountain lions, and Bonneville Cutthroat Trout, and diverse geography ranging from alpine zones to sagebrush habitats. Within the Park, Lehman Caves is a critical natural resource that provides a habitat for macroinvertebrate species found nowhere else in the world. The Park's recreational opportunities include fishing, hiking, camping, wildlife viewing, and touring Lehman Caves. The Park is located in Baker, Nevada. Baker is a small and interconnected town of fewer than 130 people.

The superintendent of the Park oversees Park operations, executes the laws as they apply to the Park, speaks on behalf of the Park, and otherwise serves as the "voice and face" of the Park. Over the course of the relevant activities on Snake Creek and Baker Creek, there were several Superintendents. Al Hendricks, deceased, was the Superintendent of Lehman Caves National Monument from 1981 to 1986, and the Superintendent of the Park from 1986 to 1995. Steven Mietz was Superintendent of the Park from 2013 to 2017. James Woolsey was the Superintendent of the Park from 2018 to 2023.

Plaintiff Baker Ranches, Inc. ("Baker Ranches") is an agricultural business operating in Nevada and Utah. It is owned by three brothers: Dave, Craig and Tom Baker (collectively, "the Bakers"). Baker Ranches provides jobs to about 34 people. Baker Ranches previously was owned by the Bakers' father, Dean Baker, and before him, the Bakers' grandparents, Fred and Betty Baker. Fred Baker died in 1988, Betty Baker died in 2008, and Dean Baker passed away in 2017.

Baker Ranches owns 2,514 acres of land in Baker, Nevada and appurtenant water rights that is irrigated with water from Baker and Lehman Creeks and has been since 1872. Ninety-five percent of the water used at its agricultural operation comes from Baker Creek and Lehman Creek. Baker Ranches' range allotment uses Snake Creek water. Baker Ranches also owns 280 acres of

land in Garrison, Utah and appurtenant water rights from Snake Creek for irrigation and stock water, known as the Garrison Property. They acquired the property in 1997. Snake Creek water has been used on the Garrison Property since at least 1880. Since 2004, Baker Ranches has leased another farm in Garrison from Plaintiffs Owen and Patricia Gonder, consisting of 208 acres and appurtenant water, including from Snake Creek with an 1880 priority that is used for irrigation and stock water. Baker Ranches has sold water for profit, including to White Pine County, Nevada, and residents of Baker, Nevada, including in 2012, 2022, and 2023. In addition to the Baker Ranch and the Garrison Property, Baker Ranches owns other farms, ranches, grazing allotments, and associated water rights and springs in Snake Valley, from Burbank Meadows in the south to Silver Creek in the north.

The remaining Plaintiffs also own water rights in Baker Creek and Snake Creek. Plaintiffs Christopher C. Wheeler and Alicia Lyn Wheeler own 147.5 acres of farm and ranch land and appurtenant water rights in Garrison that is irrigated with water from Snake Creek with an 1880 priority. Plaintiffs David John Eldridge And Ruth Eldridge, as Co-Trustees Of The David John Eldridge And Ruth Eldridge Family Living Trust, dated January 31, 2007, own 8.8 acres of pasture in Baker, Nevada that has been irrigated with Baker and Lehman Creeks water since 1872. Plaintiffs Zane Jordan and Judee Schaley own 7.13 acres of pasture in Baker, Nevada that has been irrigated with Baker and Lehman Creeks water since 1876.

### B.  Baker Creek

The headwaters of Baker Creek arise in the Park. Baker Creek flows generally west to east through the Park for about five miles. Baker Creek, the largest creek in the Park by volume, supports a variety of wildlife, ranging from elk and mountain lions to cave dwelling macroinvertebrate species endemic to the Park. Baker Creek is a rare resource in a largely desert environment, and the caves are world-class resources within the Baker Creek drainage.

The flow of Baker Creek varies throughout the year, and, at times, annual precipitation causes reduced flow. Annual precipitation, including as spring runoff, and geography cause Baker Creek's main channel to shift and "braid," or develop multiple channels. Baker Creek has a half-mile section within the Park known as "the Narrows." The Narrows comprise a losing reach of

Baker Creek, meaning, the flow of Baker Creek sinks into the alluvium of the channel. Baker Creek naturally flows by, and at times through, caves located within the Park. Two particular features in the Narrows are known as Ice Cave and Sink.

Both Plaintiffs and Defendants have water rights in Baker Creek. Pursuant to the Baker-Lehman Decree, a court order dated October 16, 1934, and amended on February 23, 1950, Plaintiffs Baker Ranches, David John Eldridge and Ruth Eldridge Family Living Trust, and Zane Jordan and Judee Schaley hold water rights to irrigate lands in White Pine County, Nevada. Baker Ranches also holds water rights permits for Baker and Lehman Creeks issued by the Nevada State Engineer to irrigate additional acreage. The point of diversion associated with these rights is located beyond the Park boundary. The United States was not a party to the adjudication or decree. The Baker-Lehman decree only concerned irrigation rights. The United States acquired two rights decreed in the adjudication after its conclusion and holds unadjudicated federal reserved water rights.

There is a long history of human activity on Baker Creek that predates the Park. A diversion at Dynamite Cave was blown open by water users, Craig Baker's father used a bulldozer along the Baker Creek channel, and Bentonite was poured into the stream channel to prevent seepage. A road to the Grey Cliffs Campground has been in place since at least 1962. For about ten years starting in 1966, Daisy Gondor visited Baker Creek to move rocks to cause the creek to flow in or out of caves. On June 3, 1973, Fred Baker directed water out of Baker Creek and into nearby caves to avoid downstream flooding. All of the water user's various activities along the creek predate the Park's establishment.

Both before and after the Park's creation, various documents reflected that water rights would continue to be respected within the Park, but not that Plaintiffs would be provided with an unmitigated right to alter conditions along Baker Creek without oversight. A 1961 letter from the Secretary of the Interior informed Congressman Baring that, should a Park be established, Fred Baker would not be prevented from clearing stoppage from creeks, and an arrangement could be worked out with a ranger. The Park's Enabling Act created the Park to preserve the natural, geologic, historic, and archaeological resources of the region for future generations subject to

existing rights and limited federal reserved water rights. See 16 U.S.C. § 410mm-1(a), (d), (h). On May 8, 1987, the Nevada Division of Water Planning sent the Park a document which provided that the Park should not interfere with the flow of stream systems subject to claims of vested rights.

After the Park's establishment, the water users continued to alter conditions along the creek and within the Park. Kevin Gonder worked on Baker Creek after the Park was established. As of approximately 1999-2000, Craig Baker made annual visits to sections of Baker Creek to identify obstructions and manipulated the flow of Baker Creek by removing debris or using objects like rocks or wood to redirect the flow of Baker Creek. Mr. Baker did not encounter Park staff or receive Park permission to engage in their activities. On April 1, 2021, a subset of the Plaintiffs in this case filed a Complaint in the Seventh Judicial District Court of the State of Nevada seeking a Court order enjoining the United States from diverting or using water from Baker or Lehman Creeks in excess of their decreed rights.[1] Baker Ranches, Inc v. Haaland, No. 3:21-CV-00150-GMN-CSD, 2024 WL 3927263, at *1 (D. Nev. Aug. 23, 2024). Following litigation, in 2023, the Seventh District Court granted an injunction allowing the Bakers to alter the flow of Baker Creek. The Ninth Circuit later vacated the district court's remand of the case to the Seventh District Court.

In two instances after the Park's establishment, the Park used water from Baker Creek for activities within the Park. In July 1987, Fred Baker's attorney sent a letter to Superintendent Hendricks stating that if the Park intended to supply water from Baker Creek to the campgrounds, it would damage Mr. Baker's water right. The Forest Service had built the campgrounds and used Baker Creek and Lehman Creek to supply water to those campgrounds via spigots. Superintendent Hendricks notified the Park staff that they were not to activate the water systems at the campgrounds and to post signage alerting visitors of the change in water access. Dean Baker advised Superintendent Hendricks that he did not like the signs and that the Park could use water for the campgrounds. The Park removed the signs and re-activated the water systems of the Park's campgrounds. In 1992, Dean Baker sent a letter advising Superintendent Hendricks that the Bakers would allow the Park to use the water on a temporary basis and that use would continue only as

---

[1] The Court takes judicial notice of the claims raised in the Complaint. See Fowler Packing Co., Inc. v. Lanier, 844 F.3d 809, 813 (9th Cir. 2016) ("We take judicial notice of the fact that this case was filed and that a nonproductive time claim was alleged.").

long as it was agreeable with the Bakers. He provided a letter of understanding wherein the Park could use water at the four developed campgrounds but could not claim ownership of the water or build new facilities. The Park never entered into an agreement with Baker Ranches regarding the use of the water. By 2023, the Park had ceased to use water from Baker Creek at the campgrounds.

Later, in 2012, the Park, advised by Peter Fahmy, who was, at that time, an attorney with the Office of the Solicitor with the U.S. Department of the Interior, relied on Nevada's exemptions for insignificant water use to temporarily use water from Baker Creek for dust abatement. Afterwards, Eric Lord, a water rights specialist, consulted the State Engineer of the Nevada Division of Water Resources regarding this water use. The State Engineer verbally advised the Park that a water right may be required for insignificant water use.

On one occasion, Park rangers stopped the Bakers from changing conditions along the creek. On April 7, 2012, Craig Baker and David Baker began moving rocks, by hand and with a crowbar, to stop Baker Creek from flowing into Sink Cave. Park rangers Nathan Snyder and Greg Moore encountered them doing so, and Mr. Moore informed the Bakers that such actions were a violation of park laws.[2] David Baker informed the rangers that he had water rights to Baker Creek, and that he was allowed to alter the creek. Craig Baker informed the park rangers that he had altered the creek in the past and had never been told that he could not do so. At Mr. Moore's request, the Bakers stopped their work, and Mr. Snyder drove the Bakers to their truck. The Bakers and the two park rangers reconvened at a Park office where Mr. Moore spoke with then-Superintendent Andrew Ferguson by telephone. The Park then permitted the Bakers to return to the section of Baker Creek and resume their work, which the Bakers did. The Park did not cite the Bakers. During this time in 2012, Eric Lord, a water rights specialist, requested from the Solicitor's Office an opinion addressing the overall prioritization of water rights on Baker Creek and the Bakers' practice of manipulating the stream channel. He was involved in drafting, but no opinion was issued.

During Superintendent Mietz's tenure, he met with the Bakers regarding the Park's

---

[2] Per the Incident Report, these included: 36 C.F.R. § 2.1(a)(1)(iv), which prohibits "[p]ossessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state: [a] mineral resource or cave formation or the parts thereof," and 36 C.F.R. § 2.31(a)(2), which prohibits "tampering . . . with property or real property, or moving, manipulating or setting in motion any of the parts thereof [. . .]."

management of Baker Creek. He initiated meetings with the Bakers and advised them that they should contact the Park if they had a problem with a condition in the Park. On March 13, 2014, he met with the Bakers to discuss Baker Creek and Snake Creek and to share with them a packet of information that the Park was submitting to the State of Nevada. He informed the Bakers that they could not move materials in the creeks within the Park and would be subject to citation. Craig Baker responded that the Park's enabling legislation meant that "a different standard" applied to the Park. Superintendent Mietz disagreed.

Following this meeting, the Park responded to various issues raised by the Bakers, including manmade obstructions on Baker Creek and the impact of the Park road. In June 2016, Craig Baker reported manmade obstructions in Baker Creek to Superintendent Mietz. In response, Superintendent Mietz invited Mr. Baker to the Park, and Mr. Baker pointed out small wading pools, apparently built by nearby campers. At Superintendent Mietz's direction, Mr. Roberts and a colleague went to Baker Creek and removed the three rock dams they found. Mr. Roberts observed two additional obstructions in Baker Creek that he did not remove, as they appeared to be formed by natural processes. On two other occasions, Mr. Roberts engaged in stream inventories along Baker Creek and would remove manmade structures if found. Also in 2016, Craig Baker reported to Superintendent Mietz that the road accessing Grey Cliffs Campground in the Park caused Baker Creek to flow into Ice Cave. In response, Mr. Roberts invited Mr. Baker to visit the area and discuss his concerns with a Park hydrologist, and Mr. Baker did so. During Mr. Woolsey's tenure as Superintendent, he instructed chief ranger, Josh Vann, to periodically go look at Baker Creek to see if there were any dams and to remove them. He did not request permission from Baker Ranches to do so. In 2023, Craig Baker's application for a Special Use Permit to survey cultural sites along Baker Creek was verbally approved.

At different points, the Park engaged in various actions along Baker Creek without seeking the Baker's permission to do so. In 2013, the Park participated in a dye tracer study where three dyes were released at different locations along Baker Creek to visually and chemically track the flow of Baker Creek. In July 2019, the Park hydrologist, Gary Smillie, reported on her inspection of fluvial conditions associated with a road crossing of Baker Creek, including if the Park berm

and culvert infrastructure unnaturally shunted Baker Creek flow so as to cause a portion of the creek to flow into Ice Cave. She concluded: "The unstable nature of Baker Creek in the area of Grey Cliffs Campground appears to have little to do with the road berm and culverts." She cited several conditions impacting the flow of the creek, including the unstable channel, steep geography, road, heavy sediment load, human-built flow modifiers, and heavy vegetation. In the 2000s, Mr. Roberts testified that there was potentially a felling of trees along Baker Creek in response to a beetle outbreak.

The Bakers testified that the Park's management of Baker Creek, including engaging in fire suppression activities, maintaining the Park road, adding some plantings, and failing to remove obstructions along the creek, impact their water rights by reducing the flow. Caves, roads, and riparian vegetation, all located in the Park, obstruct, divert or consume Baker Creek flow. From around 2020 to 2023, debris in Baker Creek, including rocks and trees, directed Baker Creek to flow into nearby caves. The extent of the impact on the water rights cannot be precisely determined, but it is not insignificant.

### C. Snake Creek Pipeline

The headwaters of Snake Creek arise in the Park. Snake Creek generally flows west to east through the Park for about eight miles, exits the Park, and flows through Nevada to Utah. Snake Creek supports a variety of fish, wildlife, and vegetation, including a large population of Bonneville Cutthroat Trout. The Park has worked alongside the States of Utah and Nevada to restore the Bonneville Cutthroat Trout population, which was the subject of Endangered Species Act listing petitions. The Nevada Department of Wildlife owns a fish rearing station adjacent to Snake Creek that uses water transported through the pipeline and holds a non-consumptive water right permit for wildlife purposes.

Plaintiffs Baker Ranches, Christopher Wheeler, Alicia Wheeler, Owen Gonder, and Patricia Gonder have rights to specific volumes of water, for the purpose of irrigation, from Snake Creek. The point of diversion associated with these rights is located in Utah, beyond the Park boundary. About twenty percent of the water used at the Baker Ranches' Garrison, Utah agricultural operation comes from wells. Plaintiffs Christopher Wheeler and Alicia Wheeler's farm

also uses water from Snake Creek and wells to irrigate acres. The farm's use of Snake Creek water significantly varies.

The Snake Creek Pipeline ("the pipeline") is a three-mile pipeline located entirely within the Park. The pipeline consists of an intake structure on Snake Creek, three miles of concrete pipeline, and metal culverts. The pipeline transports the water in Snake Creek over a losing reach of the creek where the creek loses water as it flows downstream. Prior to the pipeline's construction, Owen Gondor would use bentonite to prevent water from sinking into the ground. Snake Creek also has gaining reaches. A "gaining reach" is where groundwater comes back into the creek itself. The pipeline crosses Snake Creek in four locations and, at times, travels under the Snake Creek Road. The furthest upstream crossing is a concrete pipe of the same material as the rest of the pipeline. The other three stream crossings are culverts above the channel that are connected to the pipe with concrete joints. The pipeline leaks in at least five locations, three above-ground and two underground. The visibility of the leaks depends on the time of year. The pipeline tends to leak most severely during spring when the pipeline's water pressure is high. The leaking started around 2016.

On February 19, 1962, the Snake Creek Irrigation Company ("the Company") was granted a Special Use Permit by the Forest Service. Before granting the permit, there was a long investigation period involving a number of studies on the potential impact of the pipeline. The Company is an unincorporated association consisting of the Dearden Land and Livestock Company, Vivian H. Dearden, Vera E. Dearden, Lee Dearden, Zelma Dearden, Daisy Gonder, Wayne D. Gonder, Mollie M. Gonder, Emerson Gonder, and Owen L. Gonder. The permit granted them permission to use, subject to certain conditions, the unsurveyed national-forest land along Snake Creek in order to construct and maintain a concrete pipeline. It provided that: "Upon abandonment, termination, revocation, or cancellation of this permit, the permittee shall remove within a reasonable time all structures and improvements except those owned by the United States, and shall restore the site unless otherwise agreed upon in writing or in this permit. If the permitee fails to remove all such structures or improvements within a reasonable period, they shall become the property of the United States, but that will not relieve the permitee of liability for the cost of

their removal and restoration of the site." Finally, the permit provided that it was not transferable. Subject to these conditions, the Snake Creek Irrigation Company was granted permission to build on the Forest Service land.

However, the Company still needed to secure funding to build the pipeline. Therefore, on March 16, 1962, they entered into an agreement with the State of Utah. Utah, acting through the Utah Water and Power Board, agreed to loan them $48,000. As collateral for the loan, Utah required the Company to convey title "to the real estate upon which the structures are to be constructed" as well as "title to such easements and rights-of-way as shall be necessary to enable the state to construct, maintain and operate such project[.]" Once the loan was repaid by the Company, Utah no longer needed its collateral. Through a quitclaim deed on June 11, 1979, the State of Utah granted to the Snake Creek Irrigation Company all right, title, and interest in the pipeline, as well as an easement associated with it.

Once the pipeline was built, occasional maintenance was required, which the Snake Creek Irrigation Company was allowed to do pursuant to the Special Use Permit. Letters from 1963 and 1964 reflect that, as a permittee of the Forest Service, the Snake Creek Irrigation Company, was responsible for rectifying damage resulting "from the exercise of the privilege granted by the permit." At some point before 1986, Owen Gondor repaired one of the culverts and a joint in the concrete. Darwin Wheeler also recalled assisting on a repair sometime in 1986 or 1987, as well as clearing the intake.

On March 1, 1978, the Forest Service issued a second permit to the Snake Creek Irrigation Company, which superseded the first permit. It expired on February 1986. Several months later, on October 27, 1986, Great Basin National Park was established. On December 16, 1986, the Forest Service sent a letter to the Company stating that since the creation of the Park, the Forest Service "no longer had jurisdiction of the land used for your water transmission and range facility." The letter instructed the Company to contact the Park "to work out permit arrangements." On January 7, 1987, the Forest Service sent a letter to the Company regarding an overdue fee for the pipeline's Special Use Permit. On January 8, 1988, the Forest Service sent a letter refunding $30 for the pipeline's Special Use Permit, and instructed the Company, to contact the Park regarding

the "special use." On June 8, 1988, Park employee Bruce Freet spoke with Owen Gonder by telephone regarding leaks along the pipeline. Mr. Gonder stated he would discuss the matter with "other permittees." In 1994, the Park issued its Water Resources Management Plan, which provided that water improvements such as "pipelines" are to be "maintained by the permittee if the permittee paid for them, or by the park if they were constructed with federal funds." Therefore, from February 19, 1962 to February 1986, the Snake Creek Irrigation Company was granted access to federal land to repair the pipeline pursuant to two Special Use Permits and, after this period, there was no permit in effect governing maintenance of the pipeline.

During the period that followed, representatives of the Park and the Bakers testified that ownership of the pipeline was unclear. Superintendent Hendricks testified that a functioning pipeline was not an urgent priority for the Park following its establishment. Ben Roberts, Chief of Natural Resources at the Park, testified that it was the Park's understanding that because there was not a current Special Use Permit and both of the former Forest Service Special Use Permits were temporary and had expired, the Park may have owned the pipeline. Mr. Roberts testified that he was not aware of documentation that would indicate that the Park knew that the Bakers claimed ownership of the pipeline. In fact, in 2012, Craig Baker was not prepared to say one way or the other whether he had a right to repair the pipeline. Similarly, Superintendent Mietz, whose tenure began in 2013, testified that the operation and ownership of the pipeline was unclear and he never received concrete evidence that showed definitive ownership of the structure. Following a meeting with the Bakers, Superintendent Mietz shared Park documents but did not receive documents from the Bakers in response, such as the quitclaim deed related to the Snake Creek pipeline, until the Special Use Permit application. During Superintendent James Woolsey's tenure as Superintendent from 2018 to 2023, he testified that no one approached him to claim ownership of the pipeline or to seek to conduct repairs.

During this period, the Park engaged in several studies and projects along the pipeline, primarily without permission from the Bakers. In 2015, David Prudic, a hydrologist, published a paper on the water flow in Snake Valley. In November 2015, Mr. Roberts conducted a project where the Park diverted water from the pipeline to evaluate the losing reach of Snake Creek

without seeking permission from the Bakers. Notes maintained by the Park state that as of June 28, 2016, the Park was concerned about the pipeline's impact on the Park's natural resources and sought assistance to assess and monitor the environmental consequences of the pipeline. The Park noted that such an analysis would be focused "only on resource assessment and monitoring" and not related to "legal issues associated with the pipeline or the practicality of removing the pipeline[.]" The Park considered studies of the hydrology along Snake Creek, including possible impacts if the flow in the pipeline were reduced, the flow in the pipeline shut off seasonally, or the pipeline removed. In August 2016, Mr. Roberts twice diverted water from the pipeline to the Snake Creek channel in an effort to eliminate an invasive fish species. The first time, he telephoned Craig Baker to advise him and asked, "Is that okay?" The second time, he did not call Mr. Baker. In 2018, the Park again diverted water from the pipeline to counter invasive fish. Mr. Roberts again called to inform Mr. Baker but did not seek permission. In 2020, the United States Geological Survey ("USGS") published a scientific paper analyzing the impact of the pipeline on the riparian cottonwood forest paid for by the Park service. Finally, in October 2020, Mr. Roberts, the Water Resources Division, and USGS worked on a dye tracer study on Snake Creek that was published in 2023. The Park informed Baker Ranches of the study, but did not seek permission. The history of the Park's actions along the pipeline reflect an effort to keep the Bakers informed of their actions impacting the pipeline, but not any form of recognition of Baker ownership of the pipeline.

After the expiration of the permit, there were several instances when the pipeline required repairs, which were effectuated by both the Bakers and the Park. Growing up, Christopher Wheeler and his family would clear debris from the head gate of the pipeline. He continued to do so as an adult and did not encounter Park employees. On an annual basis, Craig Baker also cleared the intake structure of sediment build-up. In 1992, Dean Baker sent a draft letter of understanding to Superintendent Hendricks that would have allowed the Bakers to engage in routine repairs along the pipeline without further contact between the parties, but it was not signed. In 2005, Craig Baker and others replaced a culvert in the pipeline following verbal permission from Acting Superintendent Jim Schlinkmann. In 2012, Craig Baker observed that boards used to cover the pipeline's intake structure had been moved so as to block the incoming flow of water and moved

the boards back to their original place. Mr. Baker reported this vandalism to the Park and Superintendent Ferguson gave Mr. Baker permission to install new boards on the intake structure. During a later meeting with the Bakers, Superintendent Mietz advised them that if they had concerns about the pipeline, they should not take matters into their own hands, as such actions could create a safety hazard for people and the Park's ecosystem. Finally, in 2021, Superintendent Woolsey, Mr. Roberts, and Glen Dearden, used industrial foam and a gasket to repair the pipeline in two locations. Though Craig Baker was aware of the Park conducting the repairs, Mr. Roberts did not seek permission from Baker Ranches before doing so.

During this time, the Park indicated that further repairs on the pipeline would require bringing it back within a permitting structure. In 2012, Craig Baker met with Superintendent Andrew Ferguson, Chief of Natural Resources Tod Williams, and Mr. Roberts and informed the Park that a culvert in the pipeline required repairs. Mr. Williams noted that the pipeline required and lacked a Special Use Permit and that repairs would require an Environmental Impact Study. Two years later, around 2014, the Park Pacific West Regional Office ("Regional Office") advised Superintendent Mietz that the pipeline was an "unpermitted structure" within the Park and instructed him "to try and get it under some type of permit." Superintendent Mietz envisioned an agreement between the Park and a permitee that would set forth terms of the pipeline's ongoing use and maintenance.

Therefore, the varied activities along the pipeline, including the repairs and studies enacted by both the Bakers and the Park, reflect that there remained serious questions regarding who was responsible for maintaining the pipeline, whether it was being operated under a valid permit, whether it was privately owned, or whether it was subject to Park oversight.

In 2016, the Park instructed the Bakers that a Special Use Permit would be required to repair the pipeline. On August 26, 2016, Superintendent Mietz, after consulting with the Regional Office and the Water Rights Branch with the Park Water Resources Division, asked Craig Baker by telephone to submit an application for a Special Use Permit regarding the proposed scope of work on the pipeline. He followed up via email, and, on September 7, 2016, Craig Baker submitted an application for a Special Use Permit to the Park. In the application, Baker Ranches proposed to

"repair and maintain" the pipeline in four locations, including using heavy machinery and vehicles to change a culvert, replace concrete supports, remove dead trees, remove a living tree, and repair two breaks in the pipeline. The application sought sixteen days for the proposed repairs and maintenance.

When Special Use Permits are submitted, Park staff are tasked with reviewing the applications to both assess potential impacts on the Park and to determine if the application requires an analysis under the National Environmental Policy Act ("NEPA") or the National Historic Preservation Act ("NHPA"). Superintendent Mietz, in consultation with Park staff including Mr. Roberts, observed that the proposed scope of work exceeded that of emergency repairs and involved extensive reconstruction of the pipeline. Such work exceeded what Superintendent Mietz could authorize under a categorical exclusion pursuant to NEPA and would likely require an environmental assessment. It would likely also require closing a portion of the Park, including shutting down campsites, trailheads and hiking trails, and redirecting visitors away from the Snake Creek area. To close the Park would require approval from the Regional Director. Superintendent Mietz also noted the impact on natural resources including removal of trees, use of a backhoe, and reworking of a natural riparian area. Finally, the issue of the uncertain ownership of the pipeline impacted both who would pay for the NEPA analysis and whether the Bakers, if they owned it, could proceed with a Right-Of-Way Permit instead of a Special Use Permit. Therefore, the Park launched a document search related to the pipeline and submitted that information to the Regional Office for review.

Throughout 2016, the Park kept the Bakers informed of the complex issues raised by the Special Use Permit. Following an email from Craig Baker on September 19, 2016, Superintendent Mietz informed him that the Park was working on a Response letter. This letter was sent on September 26, 2016. It outlined that Special Use Permits are a "multi-step process" the first step of which was a policy review to determine whether Baker Ranches retained "valid ownership of the water diversion and pipeline structures." The letter asked the Bakers to provide supporting documentation reflecting the Bakers' ownership. The letter additionally provided that a Special Use Permit required compliance with NEPA and NHPA and that the Park may request that the

permittee secure an independent contractor to provide the required NEPA analysis. Finally, the letter provided that in order to move forward, the Park required additional site-specific information, a safety plan, and permits from the Nevada Division of Environmental Protection and U.S. Army Corps of Engineers. In response to an October 19 email from Craig Baker asking for an update, Superintendent Mietz provided that the Park was reviewing the materials and could not estimate a response time. In response to another email on November 1, 2016, Superintendent Mietz emailed Craig Baker advising him that "[t]here are complicated issues involved with this SUP application that the NPS is currently working on. Unfortunately, I cannot give you a definitive timeline at this point. Thank you for your patience."

At that point, Superintendent Mietz reached out to set up a meeting with Craig Baker. During the November 10, meeting, Superintendent Mietz addressed multiple issues arising from the application, including that the Park could not determine who owned the pipeline, that the proposed scope of work in the application would impact Park resources, that the permit required an analysis under NEPA, and that the Park sought additional information related to the application including any further documentation showing the ownership of the pipeline which had not yet been received. They also discussed ways to reduce the pressure on the pipeline. The Bakers suggested stopping the water from going through the pipeline in the winter.

On November 20, 2016, Superintendent Mietz sent Craig Baker a letter summarizing the meeting, including the need for a Right-of-Way to be established, NEPA compliance and a likely Environmental Impact Statement requirement. The letter also reflected discussions about measures to protect the pipeline during the permitting and NEPA processes and the agreement to reduce water flows during high flow periods. Finally, the letter explained that the Park was contacting the State of Utah regarding outstanding questions about the quitclaim deed. On December 7, 2016, Craig Baker responded that the letter accurately reflected their meeting.

On February 20, 2017, counsel for Baker Ranches sent a letter to the Park. Craig Baker emailed Superintendent Mietz asking when the Park would respond to their attorney's letter regarding their claim for a right of way for the pipeline. In response, in a May 25, letter the Park's Acting Superintendent informed Craig that his attorney's letter had been sent to the Water

Resource Division and the Park's Solicitors Office for review. It notified the Bakers that the Park was considering contracting out the NEPA analysis and that the Park was funding a two-year study designed to facilitate the future NEPA process. Finally, it stated that if the Bakers disagreed with the proposal, they could fund a contractor to conduct the required NEPA analysis.

On April 16, 2018, the Regional Office, in consultation with the U.S. Department of the Interior, Office of the Solicitor and the Office of the General Counsel responded to the Baker's letter. The Regional Office concluded that the Bakers were not the successors in interest to the Snake Creek Irrigation Company and stated that they required further documentation "establishing that Baker Ranches is the successor in interest to the Company should we move forward with considering your special use permit application." The letter further advised that, as the Bakers had been informed since September 2016, a NEPA analysis was needed before the Park could issue a permit for the pipeline. The record does not reflect that the Bakers responded or provided this additional documentation. Therefore, in the Park's last correspondence with the Bakers, the Regional Office informed them that the pipeline was not subject to a current valid permit and provided the information the Park would need in order to consider a permit, including the necessity of a NEPA analysis.

## III.    LEGAL FINDINGS

Equitable estoppel against the United States is a rare and historically disfavored remedy that must be applied "with utmost caution and restraint." Schuster v. Comm'r, 312 F.2d 311, 317 (9th Cir. 1962); United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir. 1973). A plaintiff asserting equitable estoppel against the United States bears a "stringent" and "heavy" burden of proof. Wagner v. Dir., Fed. Emergency Mgmt. Agency, 847 F.2d 515, 519 (9th Cir. 1988); United States v. Omdahl, 104 F.3d 1143, 1146 (9th Cir. 1997).

When a party seeks to invoke equitable estoppel against the United States, in addition to the traditional elements of estoppel, the party must also satisfy two additional elements. Watkins v. U.S. Army, 875 F.2d 699, 709 (9th Cir. 1989). These additional elements must be shown as a threshold matter before deciding whether the traditional elements of estoppel are present. Id.

First, the plaintiff must show that the United States engaged in "affirmative misconduct

- 18 -

going beyond mere negligence." Id. "There is no single test for detecting the presence of affirmative misconduct; each case must be decided on its own particular facts and circumstances." Id. "Affirmative misconduct does require an affirmative misrepresentation or affirmative concealment of a material fact by the government. . . although it does not require that the government intend to mislead a party." Id. A finding of affirmative misconduct hinges on an "affirmative misrepresentation or affirmative concealment of a material fact" that exceeds mere negligence. United States v. Ruby Co., 588 F.2d 697, 703−05 (9th Cir. 1978); see also S & M Inv. Co. v. Tahoe Reg'l Plan. Agency, 911 F.2d 324, 329 (9th Cir. 1990) ("[O]nly the more egregious conduct amounts to affirmative misconduct justifying estoppel against the government").

Second, the party must show the government's conduct will cause a serious injustice and that the estoppel will not cause undue harm to the public interest. Watkins, 875 F.2d at 708; see also Johnson v. Williford, 682 F.2d 868, 871 (9th Cir. 1982) ("Where justice and fair play require it, estoppel will be applied against the government, even when the government acts in its sovereign capacity if the effects of estoppel do not unduly damage the public interest."). The injury must be "a profound, unconscionable injury" that outweighs the countervailing public interest. Lazy FC Ranch, 481 F.2d at 988−89. This second element requires "a balancing of interests in individual cases." Watkins, 875 F.2d at 708. Additionally, when a plaintiff seeks to preclude a government interest in land, as is the case here, a litigant must "prove more than the technical elements of equitable estoppel" and "must establish equities that, on balance, outweigh the 'inherent equitable considerations which the government asserts as the constitutional trustee on behalf of all the people.'" United States v. Harvey, 661 F.2d 767, 773 (9th Cir. 1981) ("[B]ecause the United States is trustee of public lands for the benefit of the general public, we have required an additional balancing test not necessary when reviewing an ordinary equitable estoppel claim.") (internal citation omitted).

Where the plaintiff satisfies these two threshold requirements, the inquiry continues to the four traditional elements of equitable estoppel: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the party asserting estoppel

must be ignorant of the facts; and (4) the party asserting estoppel must rely on the former's conduct to its injury. Watkins, 875 F.2d at 709; Purcell v. United States, 1 F.3d 932, 939 (9th Cir. 1993). For public policy reasons, the United States "may not be estopped on the same terms as any other litigant." Purcell, 1 F.3d at 939. "When the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 60 (1984). Similarly, "it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals." Schuster, 312 F.2d at 317.

### A. Baker Creek

Plaintiffs have failed to establish that the United States engaged in "affirmative misconduct going beyond mere negligence." Watkins, 875 F.2d at 707. Since this is a threshold element of their claim, Plaintiffs are not entitled to equitable estoppel against the government related to Baker Creek. See Rider v. U.S. Postal Serv., 862 F.2d 239, 241–42 (9th Cir. 1988) ("The Ninth Circuit treats affirmative misconduct as an essential requirement . . . in the absence of affirmative misconduct there could be no estoppel.").

First, the Court finds that Defendants' use of water from Baker Creek for nearby campgrounds and for dust abatement does not constitute affirmative misconduct. The record reflects that Defendants had a reasonable basis for believing they could use the contested water. The Park only activated use of the water on the campgrounds upon permission from Dean Baker. Following the Plaintiffs' challenge of this water use in related litigation, Defendants ceased to use the water. In 2012, Peter Fahmy relied on Nevada's exemptions for insignificant water use to temporarily use water from Baker Creek for dust abatement. Even if this was incorrect, it does not arise to affirmative misconduct. See, e.g., Nidoy v. Ashcroft, 111 F. App'x 466, 468 (9th Cir. 2004) (incorrect verbal advice from a federal employee to a plaintiff is not affirmative misconduct). Defendants' use of the water for the campgrounds and dust abatement may have been negligent, but it does not reflect deliberate misrepresentations or a concealment of material facts. See Baccei v. United States, 632 F.3d 1140, 1147 (9th Cir. 2011) ("Affirmative misconduct on the

part of the government requires an affirmative misrepresentation or affirmative concealment of a material fact . . . such as a deliberate lie or a pattern of false promises.") (internal citations omitted); United States v. Wang, 404 F. Supp. 2d 1159, 1163 (N.D. Cal. 2005) ("[G]ross negligence and incompetence are not sufficient to support a finding of affirmative misconduct, which requires that the Government 'either intentionally or recklessly mislead[ ] the claimant.'") (internal citations omitted). For example, Plaintiffs have not established that Defendants sought to conceal their water use from Plaintiffs, nor that they lied to Plaintiffs regarding their use of the water. Instead, Defendants articulated a justification for the use in the form of Dean Baker's permission and Peter Fahmy's interpretation of Nevada law regarding insignificant water use.

Additionally, this instant case concerns Plaintiffs' estoppel claim. Plaintiffs are not relitigating the enforcement of the Baker-Lehman Decree, which is already the subject of litigation in Baker Ranches, Inc v. Haaland, No. 3:21-CV-00150-GMN-CSD, 2024 WL 3927263 (D. Nev. Aug. 23, 2024). In that case, they explicitly sought, in part, to prevent Defendants from using Baker Creek water at the campgrounds. Cf. Complaint at 8; id. ("Defendants shall refrain from diverting and using tributary water from Baker and Lehman Creeks at the campgrounds."). In this case, their estoppel claim seeks to estop the government from preventing them from removing obstructions on Baker Creek. The parties' prior disputes concerning the use of water on Baker Creek is, at most, tangentially relevant to the estoppel claim. Instead of relying on conduct that is already the subject of a separate lawsuit, the Court now turns to a consideration of Defendants' actions related to obstructions along Baker Creek.

The Court finds that the Park's enforcement of Park regulations does not establish affirmative misconduct. Plaintiffs argue that the Enabling Act, the Nevada Division of Water Planning's document, and the Park's Water Resources Management Plan reflect that Plaintiffs' water rights must be respected. However, none of the documents reflect that this means the Park must, in perpetuity, allow Plaintiffs to alter the course of Baker Creek or forego a Special Use Permitting system. None of them grant a permanent right-of-way enabling Plaintiffs to remove debris from Baker Creek and to obstruct and redirect its flow *without oversight*. Plaintiffs also argued that the Park did not challenge the Plaintiffs' actions in managing Baker Creek for a quarter

century before changing course. However, a change in Park policy does not amount to affirmative misconduct. See Cedars-Sinai Med. Ctr. v. Shalala, 177 F.3d 1126, 1130 (9th Cir. 1999) ("[T]there is no indication that the government delayed enforcement of this policy for any improper purpose[.]"); United States v. Bell, 602 F.3d 1074, 1082 (9th Cir. 2010), amended, 734 F.3d 1223 (9th Cir. 2013) ("TCID contends that the government committed affirmative misconduct by not enforcing the OCAPs in the past . . . . The simple non-enforcement of a regulatory requirement certainly does not rise to this level."). Plaintiffs established that they and their predecessors entered on to the Park land in order to clear obstructions, move rocks to maintain the flow in the stream channels, and block the openings of caves or sinks, but not that the Park employees affirmatively misrepresented to them that they had perpetual authority to engage in these actions.  See Vickars-Henry Corp. v. Bd. of Governors of Fed. Rsrv. Sys., 629 F.2d 629, 636 (9th Cir. 1980) ("V-H never received any official indication that it actually qualified for the government benefits it was seeking[.]"); Lavin v. Marsh, 644 F.2d 1378, 1383 (9th Cir. 1981) ("Lavin chose trust over caution and he never attempted to confirm his eligibility."). Therefore, the fact that the Park took the position that Plaintiffs could no longer alter the course of Baker Creek does not amount to affirmative misconduct.

Further, the Court finds that Defendants' actions on April 7, 2012, did not rise to the level of affirmative misconduct. On that day, Park personnel stopped the Bakers from manipulating Baker Creek, citing Park regulations, before allowing them to proceed without being cited. These actions reflect an effort to ensure compliance with Park rules rather than a deliberate misrepresentation or concealment of material facts. The Bakers argued that they were entitled to alter the conditions along Baker Creek in the way they were doing on April 7, but the fact that the Park disagreed and considered a citation does not amount to affirmative misconduct. See Sederquist v. Tahoe Reg'l Plan. Agency, 652 F. Supp. 341, 347–48 (D. Nev. 1987) ("[I]t is notable that plaintiffs' did not seek information regarding the expiration date of their permit. They chose to rely on their own understanding of the law, one that turned out to be erroneous.") Lavin, 644 F.2d at 1383 ("Persons dealing with the government are charged with knowing government statutes and regulations, and they assume the risk that government agents may exceed their

authority[.]"). The Bakers could have sought to establish their right to alter the conditions along Baker Creek by filing for a Special Use Permit or actively informing the Park that they planned to move rocks and dams along Baker Creek. See Lavin, 644 F.2d at 1384 ("[B]efore invoking the doctrine of estoppel we ask whether the citizen dealing with the government has acted diligently to protect his own interests."); Sulit v. Schiltgen, 213 F.3d 449, 454 (9th Cir. 2000) ("Neither the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct.").

Finally, the Court finds that Defendants' various actions in managing the park do not rise to affirmative misconduct. Plaintiffs argued that the Park roads have altered the natural channel and shunt the water into the cave system. The hydrologist report reflected there were multiple causes for the change in the creek's course. Further, there is no evidence that Defendants built the road to alter the water in Baker Creek or withheld information about the road's impact on Baker Creek. In fact, the road predates the Park. Plaintiffs testified that the Park does not routinely inspect the creeks to actively remove potential obstructions. However, there is no evidence that the Defendants deliberately allowed visitors to build dams or sought to keep them there. On several occasions, during both Superintendent Mietz and Superintendent Woolsey's tenure, park employees did remove damns. Any alleged failure to do more to address Plaintiffs' concerns does not amount to affirmative misconduct. See Baccei, 632 F.3d at 1147 ("Baccei has not pointed to any affirmative misconduct by the IRS at all. Instead, Baccei complains of inaction[.]); Sederquist v. Tahoe Reg'l Plan. Agency, 652 F. Supp. 341, 347 (D. Nev. 1987) ("The law in this circuit is clear that a failure to act is not affirmative misconduct, especially where fault worse than negligence is not shown."); Bolt v. United States, 944 F.2d 603, 609 (9th Cir. 1991) ("[M]erely negligent oversight" is not affirmative misconduct).

Overall, nothing in the record reflects that Defendants engaged in affirmative misconduct. See Elim Church of God v. Harris, 722 F.3d 1137, 1144 (9th Cir. 2013) (defining affirmative misconduct "to mean a deliberate lie or a pattern of false promises.") (internal citation omitted); see also Mukherjee v. I.N.S., 793 F.2d 1006, 1009 (9th Cir. 1986). Since Plaintiffs have failed to establish affirmative misconduct, their claim for equitable estoppel related to Baker Creek fails.

### B. Snake Creek and Snake Creek Pipeline

Again, as a threshold element of their claim, Plaintiffs must show that the United States engaged in "affirmative misconduct going beyond mere negligence." Watkins, 875 F.2d at 707. The Court finds that Plaintiffs fail to carry this burden.

Defendants' requirement that Plaintiffs apply for a Special Use Permit does not amount to affirmative misconduct. The Court notes that there is no dispute between the parties that Plaintiffs have water rights in Snake Creek. Further, there is no dispute that Plaintiffs may enter on to Park land. Rather, the Park's position is that Plaintiffs must go through a permitting process in order to engage in extensive repairs to a structure on Park property. The Park noted the need for a permitting system governing the pipeline in 2012, 2014, and 2016. The pipeline itself was built pursuant to a Special Use Permit. Even though the Park had twice allowed the Bakers to proceed with repairs to the pipeline without requiring a Special Use Permit, a government's decision to enforce a regulation after a period of non-enforcement does not constitute affirmative misconduct. See, e.g., Bell, 602 F.3d at 1082 ("Even if the government took a different position in the past, the 'government may not be estopped on the same terms as any other litigant.'") (internal citations omitted). The Park's delayed decision to require a permitting system does not rise to the level of affirmative misconduct. See, e.g., Ruby Co., 588 F.2d at (finding Interior Department did not engage in affirmative misconduct when it decided not to resurvey land until 34 years after the BLM recommended a resurvey because the original survey appeared fraudulent). The proposed scope of work, as outlined in the Special Use Permit, would require heavy machinery and construction over sixteen days. Superintendent Mietz observed that the repair work would likely require closing a portion of the Park. Therefore, the record reflects that the Park had a reasonable basis for requiring a Special Use Permit and Plaintiffs failed to establish that requiring a permit to proceed was pretext for damaging their water rights.

The Court finds no evidence that Defendants purposefully did not act on the permit. The record reflects that Defendants were engaged in determining the relevant NEPA processes and investigating ownership of the pipeline, which impacted both payment of NEPA and which permitting system would govern. In total, the Park sent eight letters explaining issues arising from

the permit application. In the last correspondence, the Park requested further information regarding the Baker's ownership of the pipeline before proceeding and it does not appear this information was provided. Even if, as Plaintiffs argued, the Park engaged in delays, a "[m]ere delay is insufficient to constitute [NPS] affirmative misconduct." Mauting v. I.N.S., 16 F. App'x 788, 790 (9th Cir. 2001); see also In re Howell, 120 B.R. 137, 142 (B.A.P. 9th Cir. 1990) (finding a "mere unexplained delay does not show affirmative misconduct"); I.N.S. v. Miranda, 459 U.S. 14, 19, adhered to sub nom. Miranda v. U.S. Immigr. & Naturalization Serv., 694 F.2d 1171 (9th Cir. 1982) (finding no equitable estoppel in government's delay in processing petition); Nagao v. Poulos, No. C-06-3539 MMC, 2006 WL 3050858, at *1 (N.D. Cal. Oct. 23, 2006) (denying estoppel claim "because of its lengthy delay in considering plaintiff's application"); Mukherjee, 793 F.2d at 1009 (finding no affirmative misconduct where consular officer failed to inform petitioner that his visa was approved).

During the trial, Plaintiffs articulated specific Park actions regarding the pipeline that could establish affirmative misconduct, including their denial of Plaintiffs' ownership in the pipeline and internal conversations concerning the impacts of the pipeline. First, the Court finds that Defendants did not engage in affirmative misconduct by contesting Plaintiffs' asserted ownership of the pipeline. Defendants' ongoing investigation into the ownership of the pipeline was warranted because the quitclaim deed provided by Plaintiffs did not establish that the Snake Creek Irrigation Company owned the pipeline or that the Bakers were successors-in-interest to the Company. Nothing in the record reflects that the Park was aware that Plaintiffs or the government owned the pipeline and deliberately acted as if they did not. Similarly, Plaintiffs have failed to present evidence that the Park took a position regarding the ownership of the pipeline and withheld this from Plaintiffs. See Hoefler v. Babbitt, 952 F. Supp. 1448, 1458 (D. Or. 1996), aff'd, 139 F.3d 726 (9th Cir. 1998) ("The court concludes that the failure to inform the plaintiffs of the validity problems at an earlier date does not amount to ongoing active misrepresentations. There is no evidence that the defendants had information that they were withholding from the plaintiffs.").

Further, the Court finds that the Park's internal considerations of the environmental impact of the pipeline does not reflect an effort to terminate Plaintiffs' water rights or delay the permit.

The Park informed Plaintiffs, as early as 2012, that repairs to the pipeline raised environmental concerns and a possible Environmental Impact Statement, which was the subject of the Park's internal meeting, is in line with the NEPA analysis that the Park notified Plaintiffs would have to be conducted as part of the Special Use Permit process. The fact that the Park was considering a variety of options related to the pipeline, including removal, while investigating both the uncertain ownership of the pipeline and seeking technical assistance for studies on the hydrology and effects of the pipeline, does not amount to affirmative misconduct. In fact, the Park did fund research on the environmental impacts of the pipeline, including the 2020 study on the cottonwoods, and did not remove the pipeline as a result. Instead, that same year, they repaired the pipeline. The Park also raised, in a May 25, 2017, letter the possibility of contracting out the NEPA analysis "to eliminate any perceived bias of the findings." Therefore, nothing in the record reflects any intentional concealment concerning either the ownership or environmental impacts of the pipeline. See United States v. Harvey, 661 F.2d 767, 775 (9th Cir. 1981) ("[T]he government's failure to notify, even if true, could not constitute affirmative misconduct because appellants have not alleged facts establishing an active or intentional concealment. Mere negligence will not suffice."); Jaa v. U.S. I.N.S., 779 F.2d 569, 572 (9th Cir. 1986) ("[W]hile the government apparently failed to tell her why her husband withdrew his petition, it made no affirmative misrepresentations to her.").

Therefore, the Court finds that any delays in acting on the Special Use Permit reflect negligence, at best, rather than any deliberate efforts to obfuscate the Special Use Permit process, or to deliberately infringe on Plaintiffs' water rights. See Morgan v. Gonzales, 495 F.3d 1084, 1092 (9th Cir. 2007) ("Morgan's only claim of affirmative misconduct is the extreme delay of the INS in seeking to remove him. . . there is no apparent reason for the government's delay here except neglect."); Jaa, 779 F.2d at 572 ("There is no evidence that the government's delay in this case was anything but neglect."). Defendants never represented to Plaintiffs that they would approve or act quickly on the Special Use Permit, nor did they withhold relevant information regarding the permitting process. In fact, they repeatedly informed Plaintiffs of the various issues raised by the application and twice sought further information. Accordingly, there is no evidence

that the government "deliberate[ly] lie[d]" or engaged in a pervasive "pattern of false promises" to Plaintiffs. See Socop-Gonzalez v. I.N.S., 272 F.3d 1176, 1184 (9th Cir.2001) (*en banc*); Lavin, 644 F.2d at 1383. Therefore, because Plaintiffs have failed to establish affirmative misconduct on the part of the government, their estoppel claim as to Snake Creek fails.

### C. Alternative Remedies

The Court notes that the Plaintiffs may pursue alternative remedies. A denial of a Special Use Permit may be reviewable pursuant to the Administrative Procedure Action ("APA")'s "arbitrary or capricious" standard. See, e.g., McFarland v. Kempthorne, 545 F.3d 1106, 1110 (9th Cir. 2008) ("The Park Service's denial of McFarland's special use permit was not arbitrary, capricious, or in violation of the law."); KOLA, Inc. v. United States, 882 F.2d 361, 364 (9th Cir. 1989) ("The district court should have reviewed the Forest Service denial to determine that it was not arbitrary, capricious, or an abuse of discretion."); Baker Ranches, Inc v. Haaland, No. 3:21-CV-00150-GMN-CSD, 2024 WL 3927263, at *6 (D. Nev. Aug. 23, 2024) ("Plaintiffs could apply for a special use permit from the National Park Service to perform the work they seek to do on Park land and follow the available administrative remedies—up to and including another federal lawsuit—if their request is denied.").

To the extent the Bakers contend that the Park's request for further information and a NEPA analysis was pretextual and a *de facto* denial of the Special Use Permit, they may seek review of the decision under the APA. The APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Under the APA, two conditions must be satisfied for an agency action to be considered final and reviewable: (1) the agency action cannot be tentative but be the "consummation' of its decisionmaking process" and (2) the agency action must determine "the 'rights and obligations' of the parties or is one from which 'legal consequences will flow.'" Rattlesnake Coal. v. U.S. E.P.A., 509 F.3d 1095, 1103 (9th Cir. 2007) (internal citation omitted). Plaintiffs may also bring an APA claim asserting that the "decision not

to issue a special use permit constitutes 'agency action' under the APA." Drakes Bay Oyster Co. v. Salazar, 921 F. Supp. 2d 972, 984 (N.D. Cal. 2013), aff'd sub nom. Drakes Bay Oyster Co. v. Jewell, 729 F.3d 967 (9th Cir. 2013), and aff'd sub nom. Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073 (9th Cir. 2014).

Alternatively, the Plaintiffs may seek to simply file a new Special Use Permit application. While there has been ongoing litigation regarding these issues, there was and is no prohibition to the Plaintiffs filing a new Special Use Permit. Indeed, the Plaintiffs could have done this at any time during this litigation.

### D. Declaratory Judgment

In Plaintiffs' Amended Complaint, they brought a claim for Declaratory Judgment seeking a recognized right-of-way or easement for the operation and maintenance of the Snake Creek pipeline and to safeguard the Plaintiffs' rights to appropriate water from Baker Creek. This relief overlaps with the relief sought in Plaintiffs' estoppel claim where they argued that Defendants should be estopped from refusing necessary repairs to the Snake Creek pipeline or permitting the Plaintiffs to safeguard their rights to appropriate water from Baker Creek. To the extent that the Court did not resolve the Declaratory Judgment claim in the Order on the Motion for Summary Judgment, the Court now resolves the underlying rights and legal relations concerning whether Plaintiffs' have a right-of-way on Snake Creek because of their ownership of the pipeline. See Title 28 U.S.C. § 2201 (authorizing this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought").

"It is elementary that a quitclaim deed transfers only such title and interest as the grantor possessed when he delivered the title." Del Webb Conservation Holding Corp. v. Tolman, 44 F. Supp. 2d 1105, 1111–12 (D. Nev. 1999). "To determine the interest conveyed by a quitclaim deed, a court must look to the deed's chain of title." Id. "If no interest or title resides in the grantor, the grantee takes nothing." Id.

Here, the Snake Creek Irrigation Company allegedly received their interest in the pipeline by a quitclaim deed from the State of Utah. The State of Utah, in turn, allegedly acquired ownership in the pipeline from the Company, who agreed to provide title "to the real estate upon which the

structures are to be constructed" as well as associated easements as collateral for their loan. The problem is that on this record, the Company never acquired an interest in the pipeline or real estate to convey to the subsequent grantee, the State of Utah. Accordingly, the Company only conveyed their interest in the pipeline—*i.e.*, their right to use the Forest Service land pursuant to a Special Use Permit—and Utah only conveyed that interest back to the Company.[3] Additionally, the Company likely lacked the right to transfer the Special Use Permit since it was nontransferable. Therefore, since the grantor, the State of Utah, had no interest in the pipeline or land, then the grantee, the Snake Creek Irrigation Company, takes nothing. Therefore, the quitclaim deed does not establish the Snake Creek Irrigation Company's ownership in the pipeline.

Further, for the purpose of the Special Use Permit application, the Bakers cannot establish that they are successors-in-interest to the Snake Creek Irrigation Company. The Company was an unincorporated association consisting of the Deardens and the Gondors. Nothing in the record reflects that the Bakers were part of the Company or received an interest in the Company from the Deardens or Gonders. Craig Baker testified that the Bakers' ownership of the pipeline dates to 1997 when they purchased the Garrison property which is irrigated by Snake Creek. However, the deed from the purchase of the Garrison property does not reflect that any interest in the Company was conveyed to the Bakers. Therefore, as the Regional Office informed the Bakers on April 16, 2018, even if the quitclaim deed established the Company's ownership of the pipeline, the Bakers cannot establish that they are successors-in-interest to the Company.

Finally, a condition of both the February 1962 Special Use Permit, which allowed Plaintiffs to build the pipeline, and a condition of the March 1, 1978 Special Use Permit, which allowed Plaintiffs to repair the pipeline, was that, should the permit expire, the Plaintiffs shall remove the structure and, if they fail to do so, the structure will return to the ownership of the U.S. government. The permit expired in February 1986. Plaintiffs did not renew the Special Use Permit. The pipeline was not removed. Therefore, the Court finds that the pipeline likely returned to the ownership of

---

[3] "A special use permit does not create any interest in the land." Romey v. United States, No. 5:20-CV-0014-HRH, 2022 WL 2305609, at *6 (D. Alaska June 27, 2022). Nothing in the permit conveyed an ownership in the structure or the land. Instead, the permit conveyed a privilege to access federal land to build and maintain the pipeline. Once the permit expired, the permitees lost this privilege. Even if, at times, the Park continued to allow various individuals to repair the pipeline, this did not establish any ownership, but, rather, an extension of this privilege.

the U.S. government absent other interest holders who have made no claim in this case. Importantly, the Court decides this issue of ownership only for the purpose of resolving the issue before it but not to definitively establish ownership as to all potential interest holders. Regardless, the Court finds that, as the government presented during a post-trial status conference, a Special Use Permit process may proceed even if ownership is disputed.

### E. Post-Trial Motions

#### i. Defendants' Motion to Strike

Defendants filed a Motion to Strike Plaintiffs' purported claim for equitable estoppel related to Lehman Creek. Plaintiffs opposed and, alternatively, sought to amend the complaint to confirm to the evidence. At trial, the Court conditionally admitted evidence of Lehman Creek pending its ruling on this evidentiary dispute. For the following reasons, the Court grants Defendants' Motion to Strike.

"[T]he main purpose of the complaint is to provide notice of what [the] plaintiff's claim is and the grounds upon which the claim rests." In re Acequia, Inc., 34 F.3d 800, 814 (9th Cir. 1994) (internal quotation marks omitted). Nonetheless, "[Rule] 15(b) embodies a liberal policy in favor of allowing pleading amendments at any time during and even after trial." Consol. Data Terminals v. Applied Digit. Data Sys., Inc., 708 F.2d 385, 396 (9th Cir. 1983). Under Rule 15(b)(2), when an "issue not raised by the pleadings" is tried by express or implied consent, it "must be treated in all respects as if raised in the pleadings." R. Civ. P. 15(b)(2). "An amendment will be proper only if it is found that the parties either expressly or impliedly consented for a trial of the issues not raised in the pleadings." Campbell v. Bd. of Trs. of Leland Stanford Junior Univ., 817 F.2d 499, 506 (9th Cir. 1987). To establish implied consent, the plaintiff must demonstrate that the defendant "understood evidence had been introduced" to prove the issue, and that the issue "had been directly addressed[.]" In re Acequia, Inc., 34 F.3d at 814 (citation and internal quotation marks omitted). Whether to grant a Rule 15(b)(2) motion is within the Court's discretion. Rosenbaum v. City & Cnty. of S.F., 484 F.3d 1142, 1151 (9th Cir. 2007).

Plaintiffs did not provide the Defendants notice that they were raising an equitable estoppel claim as to Lehman Creek. In Plaintiffs' Complaint, Motion to Amend the Complaint, and

Amended Complaint, there is no reference to a claim regarding Lehman Creek. Instead, Plaintiffs' clearly asserted claims related to the Snake Creek Pipeline and Baker Creek.[4] Further, Plaintiffs' Partial Motion for Summary Judgment, the Parties' related Stipulated Findings of Fact, and the Court's 40-page Order resolving the motions, did not address Lehman Creek. The first time the Plaintiffs provided facts related to Lehman Creek and notice that their estoppel claim concerned both Baker and Lehman Creeks was their trial brief. See Polar Bear Prods., Inc. v. Timex Corp., 244 F. App'x 150, 151 (9th Cir. 2007) ("Even under liberal pleading standards, Timex is unquestionably entitled to some notice of Polar Bear's claims . . . . It received none prior to the attempted expansion of the trademark claim in the third proposed pretrial order.").

In response, Plaintiffs first argue that the Baker-Lehman Decree makes clear that the water rights to Baker and Lehman Creeks are managed as a single stream system. However, Plaintiffs are not seeking an adjudication of Plaintiffs' water rights pursuant to the Baker-Lehman Decree. In fact, Defendants stipulated to the existence of Plaintiffs' water rights. Instead, Plaintiffs are bringing an estoppel claim wherein they seek to be granted access to Defendants' land in order to physically manipulate stream channels. Lehman Creek is a distinct stream channel to Baker Creek and for the Court to make factual findings concerning Plaintiffs' equitable estoppel claim as to Lehman Creek would require the Court to consider the history of Defendants' and Plaintiffs' respective actions along the river, as well as the geological features on Lehman Creek that may impact streamflow to Plaintiffs' point of diversion. Such evidence specific to Lehman Creek is not evidence that Defendants were provided an opportunity to develop during discovery or prepare to address in trial as it was not included until Plaintiffs' trial brief on the eve of trial.

Next, Plaintiffs argue for amendment to conform to the evidence. However, there was no express consent to introduce evidence related to Lehman Creek. See Patelco Credit Union v. Sahni, 262 F.3d 897, 907 (9th Cir. 2001) ("Sahni does not contend that Patelco expressly consented to try the statute of limitations issue."). There was also no implied consent as Defendants objected to the

_____

[4] In the Complaint filed in the Seventh Judicial District Court of the State of Nevada, Plaintiffs did clearly bring claims concerning Baker Creek and Lehman Creek. Complaint at 8, Baker Ranches, Inc v. Haaland, No. 3:21-CV-00150-GMN-CSD, 2024 WL 3927263, at *1 (D. Nev. Aug. 23, 2024) ("Defendants shall refrain from diverting and using tributary water from Baker and Lehman Creeks at the campground."). Here, in contrast, the Amended Complaint did not include Lehman Creek.

equitable estoppel claim concerning Lehman Creek. Cf. Campbell, 817 F.2d at 506 ("Campbell argues that the parties impliedly consented to the introduction of the issue of Stanford's breach of a covenant of good faith and fair dealing because Stanford failed to object to the introduction of evidence[.]"). Because it is apparent that, entering trial, Defendants did not impliedly or expressly consent to Plaintiffs' equitable estoppel claim regarding Lehman Creek, amending the pleadings to reflect otherwise would be inherently prejudicial. Therefore, the Court finds that the conditionally admitted evidence of Lehman Creek shall be struck from the trial record.

*ii. Plaintiffs' Second Request for Judicial Notice and Motion to Strike*

Plaintiffs request that the Court take judicial notice of three documents: (1) the United States' brief to the Ninth Circuit, dated June 25, 2025, arising from the dismissal of Baker Ranches, Inc., et al. v. Deb Haaland, et al., 3:21-cv-00140-GMN-CSD; (2) an April 7, 1964 permit reflecting the United States' right to use water from "Cave Spring, tributary to Baker-Lehman Creeks"; and (3) a November 13, 2024 petition by certain plaintiffs in this case to the State of Nevada to initiate a proceeding to determine the United States' federal reserved rights to Baker and Lehman Creeks. In their Motion to Strike, Plaintiffs ask the Court to disregard the four exhibits accompanying Defendants' Post-Trial Brief and Response to Plaintiffs' Post-Trial Brief: (1) Defendants' Motion to Dismiss filed in Baker Ranches, Inc., et al. v. Deb Haaland, et al., Case No. 3:21-cv-00150-GMN-CSD; (2) the Order dismissing the case in Baker Ranches, Inc., et al. v. Deb Haaland, et al., Case No. 3:21-cv-00150-GMN-CSD; (3) Plaintiffs' Expert Disclosure pursuant to Fed. R. Civ. P. 26(a)(2)(A) in this case; and (4) Defendants' responses to interrogatories in this case. In response, Defendants ask the Court to take judicial notice of the documents.

Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)−(2). Although courts routinely "take judicial notice of court filings and other matters of public record," Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006), judicial notice is limited to the "existence of another court's opinion or of the filing of pleadings," GemCap Lending, LLC v.

Quarles & Brady, LLP, 269 F. Supp. 3d 1007, 1019 (C.D. Cal. 2017) (internal quotation marks omitted), aff'd sub nom., 787 F. App'x 369 (9th Cir. 2019). "[T]he Court may not ... accept as true the facts found or alleged in such documents." Id. (internal quotation marks omitted). Notably, a party "may not cure her failure to present the trial court with facts sufficient to establish the validity of her claim by requesting that this court take judicial notice of such facts." Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1110 (9th Cir. 2006).

The Court takes judicial notice of the filing of Defendants' brief, Defendants' Motion to Dismiss, and the Order on the Motion to Dismiss. Fed. R. Evid. 201. However, the Court will not take judicial notice of "the underlying arguments made by the parties, disputed facts, and conclusions of fact," including the date the Park stopped using Baker Creek water on the campgrounds, the establishment of certain reserved federal water rights, and the alleged inconsistency between the brief and testimony. Cactus Corner, LLC v. U.S. Dep't of Agric., 346 F. Supp. 2d 1075, 1099 (E.D. Cal. 2004) (internal citations omitted), aff'd, 450 F.3d 428 (9th Cir. 2006); see also Wyatt v. Terhune, 315 F.3d 1108, 1114 (9th Cir. 2003), overruled on other grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014) ("[T]aking judicial notice of findings of fact from another case exceeds the limits of Rule 201."); Lee v. City of Los Angeles, 250 F.3d 668, 689–90 (9th Cir. 2001) (finding a court "may not take judicial notice of a fact that is subject to reasonable dispute."). Therefore, the Court grants judicial notice of these filings, but not for the truth of the matters asserted therein.

The Court declines to take judicial notice of the remaining exhibits. Plaintiffs assert that the November 13, 2024, petition is relevant to show that Defendants' suggestions to the Ninth Circuit of alternative remedies are actually non-remedies. The adequacy of available remedies in the related litigation is for the Ninth Circuit to determine. The Court declines to take judicial notice of the petition as it is not relevant to the Court's adjudication of the estoppel claim. See Santa Monica Nativity Scenes Comm. v. City of Santa Monica, 784 F.3d 1286, 1298 (9th Cir. 2015) ("We therefore deny the City's two requests for judicial notice on the grounds that the documents to be noticed are irrelevant."); Ruiz v. City of Santa Maria, 160 F.3d 543, 548 n.13 (9th Cir. 1998) (denying request for judicial notice, in part because information to be noticed did not bear on the

"relevant issue" before the court). For the same reason, the Court declines to take judicial notice of the April 7, 1964 permit. The parties have stipulated that the United States is the successor in interest to water rights that were adjudicated in the Baker-Lehman Decree. The permit itself is not necessary to establish this fact. The permit was one of Plaintiffs' exhibits, Plaintiffs chose not to admit it at trial, and the Court declines to take judicial notice of it now. Finally, the Court declines to take judicial notice of the parties' discovery documents, including the expert disclosure and Defendants' responses to interrogatories. See AGA & Titan Inc. v. United Specialty Ins. Co., No. 2:20-CV-02698-MCS-AS, 2022 WL 3573918, at *2 (C.D. Cal. Apr. 6, 2022) ("The documents Plaintiff seeks to introduce are not themselves judicially noticeable, and Plaintiff identifies no adjudicative facts from the documents that are not subject to reasonable dispute."); Perez v. DNC Parks & Resorts at Sequoia, No. 1:19-cv-00484-DAD-SAB, 2020 WL 4344911, at *2 (E.D. Cal. July 29, 2020) (internal citation omitted) ("[D]iscovery responses—even party admissions—are inherently subject to reasonable dispute and do not come from 'sources whose accuracy cannot reasonably be questioned.'").

**V. CONCLUSION**

**IT IS THEREFORE ORDERED** the Court finds in favor of Defendants as to Plaintiffs' equitable estoppel claim.

**IT IS FURTHER ORDERED** the Court takes judicial notice of the documents as described herein and **DENIES** Plaintiffs' Motion to Strike (ECF No. 132) accordingly.

The Clerk of Court is kindly instructed to enter judgment accordingly and close this case.

**DATED:** March 31, 2026.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**